**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RUBEN DEAN LEDFORD,

      Defendant-Appellant.

No. 04-1213

---

**ORDER**
Filed March 27, 2006

---

Before **EBEL**, **BRORBY**, **and HENRY**, Circuit Judges.

---

     Appellee's motion to publish the order and judgment dated November 15, 2005, is granted. The published opinion shall be filed nunc pro tunc to November 15, 2005, and is attached to this order.

                        Entered for the Court
                        Elisabeth A. Shumaker, Clerk of Court


                        By:
                            Deputy Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 15, 2005**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

v.

RUBEN DEAN LEDFORD,

   Defendant-Appellant.

No. 04-1213

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO
(D.C. No. 03-CR-429-B)**

---

Robert William Pepin, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, District of Colorado and Wyoming, Denver, Colorado, for Defendant-Appellant.

Jerry N. Jones, Assistant United States Attorney (John W. Suthers, United States Attorney, with him on the brief), Office of the United States Attorney, District of Colorado, Denver, Colorado, for Plaintiff-Appellee.

---

Before **EBEL**, **BRORBY**, **and HENRY**, Circuit Judges.

---

**HENRY,** Circuit Judge.[*]

_____

A jury convicted Ruben Dean Ledford on one count of being a convicted felon and armed career criminal in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Mr. Ledford appeals his conviction, arguing that the district court improperly admitted a hearsay statement during the trial and improperly instructed the jury. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

In February 2003, police received a report of domestic violence at a residence occupied by Mr. Ledford and his girlfriend, Kathleen Carey. When Adams County Sheriff's Deputies Eric Brodheim and Mike Shipley arrived at the house, Deputy Brodheim met Ms. Carey outside the house and began taking a report from her. Deputy Shipley searched the house for Mr. Ledford but discovered that he had departed through the back door. Rec. vol. IV, at 155, 189. Ms. Carey then led Deputy Brodheim to a bedroom and removed a .41 caliber handgun from the top drawer of a dresser. _Id._ at 157. Deputy Brodheim also

_____

[*] We previously issued this decision as an order and judgment. See United States v. Ledford, 154 F. App'x 692 (10th Cir. 2005). The government has filed a motion to publish the order and judgment, and Mr. Ledford has filed a petition for rehearing.

recovered six rounds of .41 caliber, hollow-point bullets. *Id.* at 161.

Meanwhile, Deputy Shipley found Mr. Ledford walking down a nearby street. *Id.* at 190. Deputy Shipley arrested Mr. Ledford, advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), drove him back to the house to find out what Deputy Brodheim wanted to charge him with, and eventually took him to the police station. *Id.* at 190-95.

At the police station, Deputy Brodheim again advised Mr. Ledford of his *Miranda* rights, and began questioning him. *Id.* at 163-65. Deputy Brodheim asked Mr. Ledford about the gun. *Id.* at 167. Mr. Ledford responded that he knew he was not supposed to have a gun because he was a convicted felon. He stated that, a couple of months earlier, he had received the gun from a friend, who wanted him to fix it. *Id.* Mr. Ledford also said the gun was functional. *Id.* Subsequent tests confirmed that the gun was functional. *Id.* at 205-09.

Mr. Ledford was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). To obtain a conviction under this statute, the government must establish three elements beyond a reasonable doubt: (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce. *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997). Prior to his jury trial, Mr. Ledford stipulated that he had previously been

3

convicted of a felony and that possession of the gun was in or affecting interstate commerce. Rec. vol. IV, at 13-14. The government therefore only had to prove that Mr. Ledford knowingly possessed the gun.

At trial, the government called Deputy Brodheim. During his testimony regarding his initial encounter with Ms. Carey, the following exchange took place:

> Q[uestion by Mr. Williams, the prosecutor]: And where were you?
>
> A[nswer by Deputy Brodheim]: I remained at the residence to continue taking a report from Miss Carey.
>
> Q: And without telling us exactly what she said with regard to the incident, did she tell you generally about the incident?
>
> A: Yes, she did.
>
> Q: Now towards the end of this did she express some concern?
>
> A: Yes, she did.
>
> Q: And what was that concern?
>
> MR. PEPIN [Mr. Ledford's counsel]: I object to that. That's hearsay, your Honor.
>
> MR. WILLIAMS: Your Honor, we have briefed this pretrial and we don't believe that it is hearsay. We're not offering it for its truth value, if you will allow me to refer to it as "it." We're not trying to prove the truth of this statement. It goes, number one, to the declarant's state of mind and it is by definition not hearsay.
>
> THE COURT: 801(d)(2)(A) I think covers anything that the defendant may have said to Ms. Carey. And as to her statement to the officer, it is received not for the truth of the matter asserted, but under the state-

4

of-mind exception to the hearsay rule. So under . . . 801(d)(2)(A) and state-of-mind exception to the hearsay rule, the objection is overruled.

MR. WILLIAMS: Thank you, your honor. We're talking specifically about what Ms. Carey . . . said to you that the defendant said to her.

A: She told me that Reuben Ledford told her that if she called the cops he would kill her.

Q: What happened between you and Miss Carey at that point?

A: She told me that there was a weapon in the house that belonged to Mr. Ledford and she would like me to secure the weapon for her safety.

Rec. vol. IV, at 155-56. Mr. Ledford's counsel did not object to Deputy Brodheim's testimony that Ms. Carey said the gun belonged to Mr. Ledford. *Id.* at 156-57.

Mr. Ledford later testified that the gun was not his. *Id.* at 224-226. He also testified, however, that a friend had "wanted me to look at it [to] see if I can figure it out–if I can fix it." *Id.* at 224-225. In addition, he admitted on cross-examination that he had told a bail bondswoman shortly after he was arrested that "two or three weeks" earlier a friend had said he had a "pistol that needed some work done on it." *Id.* at 252-54.

Prior to the jury instruction conference, both the government and Mr. Ledford tendered instructions defining "possession" of an illegal weapon, the only disputed element of the charge. Mr. Ledford's instruction stated that "[a] person who, although not in actual possession, knowingly has both the power and

the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it." Aplt's Br., Attach. 3. The district court provided a draft of the possession instruction containing "and the intention," to which the government objected under *United States v. Colonna*, 360 F.3d 1169, 1179 (10th Cir.), *cert. denied*, 125 S. Ct. 37 (2004). *See* Rec. vol. III, at 281.

In *Colonna*, we held that in joint occupancy situations, "[i]t is not necessary to show that a defendant intended to exercise . . . dominion or control," but only that a defendant had "knowledge of and access to the weapon[] . . . ." 360 F.3d at 1179. Mr. Ledford's counsel argued that despite the holding in *Colonna*, eliminating intent language from the instruction converted the offense into one of strict liability, thereby violating due process. *Id.* at 282-87. The court ruled that it was bound by *Colonna*, noting that eliminating an intent requirement did not convert the offense into a strict liability offense because the government still had to prove Mr. Ledford's knowledge of and access to the weapon. *Id.* at 283, 286, 287. The court gave an instruction that did not require the government to prove intention to exercise dominion and control. *Id.* at 302. The jury returned a guilty verdict, and the court sentenced Mr. Ledford to 200 months' imprisonment, followed by five years of supervised release.

6

## II. DISCUSSION

On appeal, Mr. Ledford contends that the district court erred in overruling his hearsay objection to Deputy Brodheim's testimony regarding a statement made by Ms. Carey: that she was scared because Mr. Ledford had told her he would kill her if she called the police. He also contends that the district court erred in giving a "possession" jury instruction that did not include language requiring intent. We address each argument in turn.

### A. The District Court Acted Within Its Discretion By Admitting the Statement.

We review a district court's evidentiary rulings for an abuse of discretion, considering the record as a whole. *See Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1171 (10th Cir. 2003). "'[W]e should hardly be warranted in reversing for the admission of evidence simply because the judge did not place his ruling on the ground that would most readily have supported it.'" *United States v. Knox*, 124 F.3d 1360, 1362 (10th Cir. 1997) (quoting *United States v. Ross*, 321 F.2d 61, 69 (2d Cir. 1963)). We may "'affirm the rulings of the lower court on any ground that finds support in the record, even where the lower court reached its conclusions from a different or even erroneous course of reasoning.'" *Id.* (quoting *Keyes v. School Dist. No. 1*, 521 F.2d 465, 472-73 (10th Cir. 1975)). Finally, if a party objects to a district court's hearsay ruling based solely on the

7

Federal Rules of Evidence, we review for nonconstitutional harmless error. *United States v. Jefferson*, 925 F.2d 1242, 1253-54 (10th Cir. 1991) (distinguishing between the nonconstitutional harmless error standard for review of objections based solely on the Rules of Evidence and the constitutional harmless error standard for objections implicating the Confrontation Clause, under which a court may find error harmless only if it is convinced that the error was harmless beyond a reasonable doubt).

**1.     The statement was not hearsay.**

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted," FED. R. EVID. 801(c), and is inadmissible, subject to certain exceptions. *See* FED. R. EVID. 802. A statement offered to prove something other than the truth of the matter asserted is not hearsay.

The testimony at issue here involves two out-of-court statements, one by Mr. Ledford and one by Ms. Carey. In particular, Ms. Carey related what Mr. Ledford said to her (the first statement), and Officer Brodheim recounted what Ms. Carey said to him (the second statement). The statements thus raise the so-called "hearsay within hearsay" problem.

The first statement, allegedly made by Mr. Ledford to Ms. Carey, was: "I will kill you if you go to the police." Mr. Ledford's statement does not appear to have been offered for the truth of the matter asserted, that he would indeed kill

Ms. Carey if she went to the police. Instead, it seems to have been offered only to prove that Mr. Ledford made the threat. We need not determine the exact nature of this statement, however, because it was admissible in any event. If it was not offered for its own truth, it was not hearsay and was admissible in the first instance. If, as the district court ruled, it was offered for its own truth, it was admissible under the party admission exception to the hearsay rule, which allows a statement offered against a party to come into evidence if it is the party's own statement. *See* FED. R. EVID. 801(d)(2)(A). The admission of the statement is unquestionably correct, and is unchallenged on appeal. *See* Aplt's Br. at 12.

The second out-of-court statement is Ms. Carey's statement to Officer Brodheim: "[s]he told me that Reuben Ledford told her that if she called the cops he would kill her." Rec. vol. IV, at 156. The district court overruled Mr. Ledford's hearsay objection: "[a]nd as to her statement to the officer, it is received not for the truth of the matter asserted, but under the state-of-mind exception to the hearsay rule." *Id.* We interpret the district court's admission of the testimony as rulings that (1) the statement was not hearsay because it was not offered for the truth of the matter asserted, but (2) if the statement was hearsay, it fell under the state-of-mind exception to the hearsay rule articulated in Federal Rule of Evidence 803(3).

We agree with the district court that Ms. Carey's statement was not hearsay

9

because it was not offered to show that Mr. Ledford made a threat to kill Ms. Carey. Rather, the government offered the statement to explain why Ms. Carey led Deputy Brodheim to the bedroom. Our conclusion is consistent with other cases in which we have ruled threats were offered for purposes other than their own truth. *See United States v. Trujillo*, 136 F.3d 1388, 1396 (10th Cir. 1998) (holding that an FBI agent's testimony of a witness's description of a bank robber was offered as evidence of the focus of the investigation, not to prove the truth of the description); *United States v. Bowser*, 941 F.2d 1019, 1021-22 (10th Cir. 1991) (per curiam) (holding that an officer's testimony that an informant told him the defendant had a gun and wanted to kill the officer was admissible to explain the officer's aggressive conduct toward the defendant and was not offered for its truth); *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987) (holding that testimony about informant's statements was admissible to show why the government undertook the investigation and was not offered for its truth). Thus, the district court did not abuse its discretion in admitting Ms. Carey's statement to Deputy Brodheim as non-hearsay.

## 2. If the statement was offered for its own truth, it would have been inadmissible under the state-of-mind hearsay exception.

The government briefed and raised in the district court the argument that Ms. Carey's statement fell under the state-of-mind exception to the hearsay rule found in Federal Rule of Evidence 803(3). The district court agreed and allowed

the testimony on that ground.  We cannot affirm that decision.

Under the state-of-mind exception itself, a statement is not excluded by the hearsay rule if it is:

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

FED. R. EVID. 803(3).  Thus, the Federal Rules of Evidence contemplate an exception to the exception: a statement that would otherwise be admissible under the state-of-mind exception is inadmissible if it is a statement of memory or belief offered to prove the fact remembered or believed.

Case law makes it clear that a witness may testify to a declarant saying "I am scared," but not "I am scared because the defendant threatened me."  The first statement indicates an actual state of mind or condition, while the second statement expresses belief about why the declarant is frightened.  The phrase "because the defendant threatened me" is expressly outside the state-of-mind exception because the explanation for the fear expresses a *belief* different from the *state of mind* of being afraid.

For this proposition, Mr. Ledford cites *United States v. Joe*, 8 F.3d 1488 (10th Cir. 1993).  In *Joe*, the defendant allegedly raped his wife eight days before murdering her.  *Id.* at 1491.  While being treated for injuries sustained in the rape, the victim told her doctor that she was "afraid sometimes" because her husband

11

had threatened to kill her. *Id.* We held that the victim's out-of-court statement that she was "afraid sometimes" was admissible under Rule 803(3) because it reflected her then-existing state of mind. *Id.* at 1492. The remainder of the statement, however, did not indicate her state of mind; it was "an assertion of *why* she was afraid (i.e., because she thought her husband might kill her)." *Id.* at 1493 (emphasis in original). Because the second part of the statement was clearly a statement of memory or belief, it was not admissible under Rule 803(3). *Id.*

Similarly, in *United States v. Tome*, 61 F.3d 1446 (10th Cir. 1995), a child-molestation case, a babysitter testified that while babysitting a child, the child spontaneously asked the babysitter not to let her mother send her back to her father. When the babysitter asked the child why she did not want to return to her father, the child said "because my father gets drunk and he thinks I'm his wife." *Id.* at 1453. Relying on *Joe*, we held that the statements were not admissible under 803(3) because the first statement was not an expression of fear, and the second was clearly a "statement of memory to prove the fact remembered." *Id.* at 1454.

The government attempts to distinguish these cases by asserting that it offered the statements in *Joe* and *Tome* to prove that the threats were carried out: i.e., the person making the threats committed the threatened crime. In *Joe*, the crime was murder; the government asserts that the statement of the threat was

inadmissible because it was being offered to show that it was the defendant who killed the victim after threatening her. Likewise, the government asserts, in *Tome* the statement was inadmissible because it was being offered to show it was the father who molested the child. According to the government, those cases are inapplicable here because the statement in our case was not being offered to show that Mr. Ledford carried out the threat.

We are unconvinced. The issue is not the underlying crime charged, but what the objectionable statement is being offered to prove. Here, the relevant facts surrounding the statement of the threat are identical to those in *Joe*. To the extent Ms. Carey expressed a state of mind (concern), *Joe* and *Tome* foreclose her ability to express *the reason* for her state of mind ("I was concerned because he threatened me."). Thus, to the extent the statement here goes beyond Ms. Carey's declaration of her condition, it cannot fall under the state-of-mind exception to the hearsay rule.

### 3.  If the statement was offered for its own truth, it would have been admissible under the "excited utterance" hearsay exception.

Nevertheless, if the statement was hearsay, it would have been admissible under a different exception to the hearsay rule. We conclude that the more appropriate exception is *res gestae*, or the "excited utterance" exception. Under this exception, "[a] statement relating to a startling event or condition made while

13

the declarant was under the stress of excitement caused by the event or condition"

is not excluded by the hearsay rule, even if the declarant is available as a witness.

FED. R. EVID. 803(2). This exception requires that (1) there was a startling event;

(2) the statement was made while the declarant was under the stress of excitement

from this event; and (3) the statement related to this event. *See id.*; *Woodward v.*

*Williams*, 263 F.3d 1135, 1140 (10th Cir. 2001) (utilizing the same three-pronged

test to determine whether a statement constituted an excited utterance under the

New Mexico rules of evidence); 6 *Wigmore on Evidence* § 1750, at 202-03, 222

(James H. Chadbourn rev., 1976 ed.). We analyze each element separately.

### a. There was a startling event.

The startling event in this case can be read in two ways, each of which was

sufficiently startling to meet the first element of the excited utterance test. First,

the domestic altercation between Mr. Ledford and Ms. Carey, culminating in his

threat to kill her, was clearly a startling event. Such an event would

understandably cause a person to be excited and stressed.

Second, because of the specific form of Mr. Ledford's threat, there was a

future trigger for startling. Mr. Ledford's threat was contingent upon Ms. Carey

calling the police, and Ms. Carey was talking to the police when relating the death

threat. While the record is unclear as to who called the police, we think the

salient feature of Mr. Ledford's death threat is police involvement, rather than

14

initiation of the involvement through the phone call. When Ms. Carey was talking to Deputy Brodheim, she was engaging in exactly the behavior for which Mr. Ledford had threatened to kill her. Therefore, we characterize the startling event here as occurring both when Mr. Ledford originally made the death threat during the altercation, and later, when Ms. Carey was speaking with Deputy Brodheim, because she was engaged in the conduct triggering the threat to her own life.

> **b.** **Ms. Carey was under the stress of excitement from the threat.**

The temporal proximity between the startling event and Ms. Carey's statement to Deputy Brodheim requires close analysis. The record reflects that the violent part of Ms. Carey and Mr. Ledford's altercation began at about 5:00 p.m. on the night of February 3, 2003, when Mr. Ledford woke Ms. Carey up from a nap and began yelling at her about the windows in the house being open. He

> grabbed her by the back of the head, by her hair, forced her to turn her head, which caused her pain to her neck and head; said Don't talk to me like I'm a punk; and then punched her in the left side of her face with his right hand.

Rec. vol. IV, at 77. Deputy Brodheim showed up within thirty minutes of this altercation, at about 5:30, because he "had a call of domestic violence that had *just* occurred." *Id.* at 74 (emphasis supplied). Ms. Carey, in relating "the events of earlier that day," *id.* at 78, told Deputy Brodheim about the threat.

Reading the startling event as the threat itself, made during the altercation

15

at around 5:00 that evening, the maximum lapse of time between the moment Mr. Ledford made the threat and the moment Ms. Carey described it appears to have been between thirty and thirty-five minutes. Under our "trigger" reading of the startling event, there was no lapse of time whatsoever, because Ms. Carey was under the danger of the threat the entire time she was talking to Deputy Brodheim. Her fear of the threat being carried out was activated as soon as Mr. Ledford could have become aware that the police had arrived. From Ms. Carey's perspective, Mr. Ledford could have known about the police involvement, and thereby been triggered to carry out the threat, as soon as the police arrived. She did not know where Mr. Ledford was when Deputy Brodheim pulled up. Thus, when she related the threat to Deputy Brodheim, she was doing so while under the immediate and direct stress of the threat.

Rule 803(2) rests on the theory that the agitated mind is much less likely to engage in conscious fabrication than the reflective mind. *See* FED. R. EVID. 803(2) advisory committee's note; *see also Paxton v. Ward,* 199 F.3d 1197, 1209 (10th Cir. 1999) (quoting *Idaho v. Wright*, 497 U.S. 805, 820 (1990)). Thus, there is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. The Advisory Committee's Note to Rule 803(2) is instructive:

> With respect to the *time element*, . . . [u]nder Exception (2) the standard of measurement is the duration of the state of excitement. "How long

16

can excitement prevail? Obviously there are no pat answers and the character of the transaction or event will largely determine the significance of the time factor."

FED. R. EVID. 803(2), Advisory Committee Notes (quoting M.C. Slough, *Spontaneous Statements and State of Mind*, 46 Iowa L. Rev. 224, 243 (1961)) (emphasis in original); *see generally* 2 JOHN W. STRONG, ET AL., MCCORMICK ON EVIDENCE, § 272 (5th ed. 1999). For this reason, courts, including this one, have repeatedly held that time lapse alone is not dispositive. *See United States v. Farley*, 992 F.2d 1122, 1123, 1125-26 (10th Cir. 1993) (noting a statement by a young child made the day following molestation could have been admitted as an excited utterance where the child was described as frightened and on the verge of tears at the time of the disclosure); *see also United States v. Rivera*, 43 F.3d 1291, 1296 (9th Cir. 1995) (holding a statement made a half hour after an assault occurred qualified as an excited utterance and stating that "[r]ather than focusing solely on the time a statement was made, we consider other factors, including the age of the declarant, the characteristics of the event and the subject matter of the statements."); *United States v. Iron Shell*, 633 F.2d 77, 85-86 (8th Cir. 1980) (holding the amount of time between the startling event and the statement is only one factor to be weighed by the court in determining whether the excited utterance exception to the hearsay rule applies).

Applying these standards, we conclude that the temporal element of the

17

excited utterance test is satisfied, whether the temporal-proximity clock began to run at the moment of the altercation and threat, or, alternatively, during the ongoing triggering event of Ms. Carey talking to Deputy Brodheim. The duration between the startling event and statement here, from zero to thirty-five minutes, was within an admissible temporal range. *See Woodward*, 263 F.3d at 1140 (admitting the statement "he is going to kill me" as an excited utterance made within a minute of the threat itself); *United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999) ("The lapse of 15 to 30 minutes between an exciting incident and a statement does not render the statement inadmissible."); *United States v. Golden*, 671 F.2d 369, 371 (10th Cir. 1982) (admitting a statement occurring within fifteen minutes of the startling event and immediately after a high-speed flight).

Accordingly, we conclude that Ms. Carey's statement was admissible under the *res gestae* exception to the hearsay rule.

c.      **Ms. Carey's statement related to the exciting event.**

Whether we construe the startling event here as the altercation and threat or as the continuing danger of speaking with police, Ms. Carey's statement to Deputy Brodheim was directly related to it. This element is easily met.

4.      **Any Error Was Harmless.**

18

Even if Ms. Carey's statement was hearsay, and even if it did not fall under any exception to the hearsay rule, we would still affirm its admission under the harmless error doctrine. *See Jones*, 44 F.3d at 873 ("This court applies a harmless error standard when reviewing trial courts' rulings on hearsay objections resting solely on the Federal Rules of Evidence."). "In conducting a harmless error review, we review the record *de novo.*" *United States v. Flanagan*, 34 F.3d 949, 955 (10th Cir. 1994). Because the erroneous admission of hearsay testimony is a non-constitutional error in this situation, *see United States v. Perez*, 989 F.2d 1574, 1583 (10th Cir. 1993) (en banc), we apply the harmless error standard from *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Under that standard, we examine the entire record, focusing particularly on the erroneously admitted statements. The question is not whether, omitting the inadmissible statements, the record contains sufficient evidence for a jury to convict the defendant. Rather, we must discern whether the statements, in light of the whole record, (1) "substantially influence[d]" the outcome of the trial, or (2) left us in "grave doubt" as to whether they had such an effect. *United States v. Birch*, 39 F.3d 1089, 1094 (10th Cir. 1994) (internal quotation marks omitted). If we answer either of these questions in the affirmative, the error requires reversal. "[T]he government has the burden of proving that the non-constitutional error was harmless." *Flanagan*, 34 F.3d at 955.

19

We are confident that any alleged error here was harmless. The only issue at trial was whether Mr. Ledford knowingly possessed the gun, because he had already stipulated to the other elements. Even if Deputy Brodheim had not testified to Ms. Carey's statement about the threat, other evidence tied Mr. Ledford to the gun, including Ms. Carey's subsequent statement to Deputy Brodheim that Mr. Ledford had a gun in the house. Crucially, Mr. Ledford's counsel did not object to that statement and does not challenge it on appeal.

Moreover, Deputy Brodheim testified that when Mr. Ledford was in police custody and had been Mirandized, he admitted to possession of the gun, acknowledging that he had received it from a friend who wanted him to fix it. *See* Rec. vol. IV, at 167. On appeal, Mr. Ledford attacks the credibility of Deputy Brodheim's recounting of that admission because he did not take notes. Mr. Ledford also asserts that he presented a credible account of the events in which Ms. Carey set him up with the police to get back at him after a fight. We cannot say which account was more credible; that is the jury's province. *See United States v. McKissick*, 204 F.3d 1282, 1289-90 (10th Cir. 2000) (noting it is exclusively the province of the jury to determine the credibility of witnesses, the weight to be accorded to the evidence presented, the reasonable inferences to be drawn therefrom, and the conclusions to be reached).

Mr. Ledford also admitted on cross-examination that shortly after he was

20

arrested, he told a bail bondswoman that "two or three weeks" earlier a friend had told Mr. Ledford that he had a "pistol that needed some work done on it." Rec. vol. IV, at 252-54. Thus, Mr. Ledford corroborated at least part of Deputy Brodheim's account.

The statement at issue here was not such a key element of the prosecution that it substantially influenced the outcome of the trial. Deputy Brodheim referred to his testimony about the threat once while he was being cross-examined: "[a]t the time the only reason why I took the gun was because she asked me to because she felt in fear of her life." *Id.* at 171. Mr. Ledford denied the threat during his own direct examination. *See id.* at 221. The prosecutor also referred to the statement in his closing argument. *See* Rec. vol. III, at 322. Although there was no limiting instruction, once the statement was in evidence there was no reason for the prosecutor not to mention it during his closing argument. Merely mentioning the statement does not convert it into the central focus of the prosecution or diminish the other evidence linking Mr. Ledford to the gun. In light of the whole record, we are confident that the statements did not "substantially influence" the outcome of the trial, and we are not left in "grave doubt" as to whether they had such an effect.

**B.     The Possession Instruction Was Valid.**

21

To prove a violation of § 922(g)(1), the government must establish the following elements beyond a reasonable doubt: (1) that the defendant was previously convicted of a felony; (2) that the defendant thereafter knowingly possessed a firearm or ammunition; and (3) that the possession was in or affecting interstate commerce. *Taylor*, 113 F.3d at 1144. At trial, Mr. Ledford disputed only whether he "knowingly possessed" the weapon.

"Possession" under § 922(g)(1) may be either actual or constructive. *See United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994). Generally, an individual has constructive possession over an object when he or she knowingly has ownership, dominion, or control over the object and the premises where it is found. *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). In most cases, dominion, control, and knowledge may be inferred where a defendant has exclusive possession of the premises; however, "joint occupancy alone cannot sustain such an inference." *Mills*, 29 F.3d at 549.

In cases of joint occupancy, "where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show some connection or nexus between the defendant and the firearm or other contraband." *Id.* "While caution must be taken that the conviction not be obtained by piling inference on inference, an inference of constructive possession is reasonable if the conclusion flows from logical and probabilistic reasoning."

*United States v. Lazcano-Villalobos*, 175 F.3d 838, 843 (10th Cir. 1999) (internal quotation marks omitted). To sustain a conviction for constructive possession, the government must present "evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon." *United States v. Hien Van Tieu*, 279 F.3d 917, 922 (10th Cir. 2002) (internal quotation marks omitted); *see also Mills*, 29 F.3d at 549-50.

The relevant passage of Mr. Ledford's proposed instruction states:

> [a] person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

Aplt's Br., Attach. 3. After receiving an objection from the government and hearing argument, the district court omitted the words "and the intention" before giving the instruction in the following manner:

> [a] person who, although not in actual possession, knowingly has the power at any given time to exercise dominion or control over a thing, either directly or indirectly through another person, is then in constructive possession of it.
> To prove constructive possession the government must prove that the defendant had knowledge of and access to the firearm.

*See* Rec. vol. III, at 302.

Mr. Ledford argued to the district court and now argues on appeal, that omitting intentionality from the jury instruction converts this crime into one of strict liability because simply being in a jointly-occupied premises with

23

knowledge of a gun would make one guilty of constructive possession.

We recently published a case that forecloses Mr. Ledford's position. In *Colonna*, 360 F.3d at 1179, the defendant was charged with being a felon in possession of a firearm. Police conducting a warrant search of his house (which he shared with his wife) had discovered four firearms and several boxes of ammunition in the top drawer of a dresser inside the defendant's bedroom. *Id.* On appeal, Mr. Colonna argued that the evidence of possession was insufficient because the government did not show that he had the intention to exercise dominion and control over the firearms. *Id.*

We rejected Mr. Colonna's argument and ruled that the government need only prove knowledge and access to the weapon, not the intention to exercise control:

> In order to sustain a conviction based upon constructive possession, the government must present evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband. Thus, *knowledge* and *access* are required to prove that the defendant knowingly held the power to exercise dominion and control over the firearm. Mr. Colonna cites an Eighth Circuit case, and argues that the government must show that he had the *intention* to exercise dominion and control. This overstates what is required. Under Tenth Circuit precedent, where the defendant in a joint occupancy situation has knowledge of and access to the weapons, there is a sufficient nexus to infer dominion or control. It is not necessary to show that the defendant intended to exercise that dominion or control, nor is it necessary to show that the defendant actually owned the weapons–mere possession is enough.

*Id.* (citations and quotation marks omitted) (emphases in original).

24

Although Mr. Ledford acknowledges that under *Colonna*, knowledge of and access to a weapon are sufficient to establish constructive possession, he nevertheless argues on several grounds that we should also require proof of intent. He contends: (1) *Colonna* is factually distinct in a meaningful way; (2) *Colonna* is contrary to prior precedent and the relevant statute; (3) § 922(g)(1) is converted into a general intent offense unless intent language is included; (4) the jury instruction here was invalid because it did not include "nexus" language; and (5) the instruction here was invalid because the Tenth Circuit Proposed Criminal Pattern Jury Instructions contain intent language. Each argument is unconvincing, and we will dispense with them in turn.

First, Mr. Ledford contends that *Colonna* is distinguishable because the government presented evidence in that case that the defendant had dominion and control over the dresser where the gun was found. His attempt to distinguish *Colonna* from this case misses the mark. Our analysis in *Colonna* did not turn on the specific nature of the evidence submitted; we held that is unnecessary for the government to prove intention to exercise dominion or control over the weapon in question. Moreover, the evidence in *Colonna* did not differ significantly from the evidence in this case. In *Colonna*, the house and bedroom were jointly occupied by two people. *Id.* The guns were found in a bedside dresser, which Mr. Colonna's wife referred to as his dresser. *Id.* Similarly, in our case, the house

25

and bedroom were jointly occupied by two people, one of whom was the defendant. Additionally, the gun was found in a bedroom dresser, just as in *Colonna*. In testimony not objected to below or challenged on appeal, Deputy Brodheim testified that Ms. Carey told him the gun belonged to Mr. Ledford and led the deputy to the weapon, thereby linking Mr. Ledford to the weapon in much the same way Ms. Colonna had linked Mr. Colonna to his weapons.

Mr. Ledford's second argument is that *Colonna* should not be followed because it is contrary to prior precedent. According to Mr. Ledford, *Colonna* is not good law because "several other decisions from this Court have endorsed the requirement that the defendant intended to exercise control over the objects." Aplt's Br. at 24. This view vastly overstates our caselaw. No case Mr. Ledford has cited holds that the government is *required to prove intent*.

*United States v. Lopez*, 372 F.3d 1207 (10th Cir. 2004), is perhaps Mr. Ledford's strongest case. The jury instructions in *Lopez* included a constructive possession instruction with "and the intention" language. We did not, however, address intent because the issue was not raised on appeal. Rather, the issue before us was whether the district court erred in omitting language requiring that the defendant have control of the premises where the firearms were found. We ruled that such an omission was not error and clarified that "constructive possession [exists] where the defendant has the power to exercise control or

26

dominion over the item." *Lopez*, 372 F.3d at 1212.

Mr. Ledford also cites *United States v. Zink*, 612 F.2d 511 (10th Cir. 1980), in which the defendant claimed that the evidence showed someone else possessed the counterfeit money he was charged with possessing. We held the evidence sufficient to show the defendant constructively possessed the money. In our analysis, we referred to a "possession" instruction containing the "and the intention" language as "a stock instruction on this issue which has been affirmed many times." *Id.* at 516. But the fact that the language was included and approved does not make it *required*. As in *Lopez*, the language of the instruction was not at issue in the case. Moreover, as in *Lopez*, we stated that the essence of constructive possession is "knowingly holding the power to exercise control over something," *id.*, a standard which does not include any requirement of intent to exercise control.

Other decisions from our court have articulated the standard for constructive possession without requiring proof of intent to exercise dominion or control. *See Hien Van Tieu*, 279 F.3d at 922; *United States v. Parrish*, 925 F.2d 1293, 1296 (10th Cir. 1991); *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir. 1987). Thus, *Colonna* is not contrary to prior controlling authority, and it governs our decision here. Moreover, we have since followed *Colonna* on the question of proving constructive possession in a joint occupancy situation. *See*

27

*United States v. Norman*, 388 F.3d 1337, 1340-41 (10th Cir. 2004) (quoting the *Colonna* language that "*knowledge* and *access* are required to prove that the defendant knowingly held the power to exercise dominion and control over the firearm") (emphases in both *Colonna* and *Norman*).  Absent intervening Supreme Court or en banc authority to the contrary, we will not overrule our precedent. *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1333 (10th Cir. 2003).

Moreover, as the district court noted, no requirement of intentionality beyond "knowingly" appears in the statute under which Mr. Ledford was charged:

> (g) It shall be unlawful for any person –
> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

18 U.S.C. § 922(g)(1).  Section 924(a)(2) prescribes the penalty for violating § 922(g): "Whoever knowingly violates subsection . . . (g) . . . of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." Reading the two statutes together, we have consistently held that the elements of the offense are satisfied with no intent language.  *See, e.g., Taylor*, 113 F.3d at 1144; *United States v. Shunk*, 881 F.2d 917, 921 (10th Cir. 1989).  As another circuit has observed, the statute "makes it unlawful for felons to possess a firearm knowingly.  It says nothing about intent." *United States v. Linares*, 367 F.3d 941, 948 (D.C. Cir. 2004); *see also United States v. Udofot*, 711 F.2d 831, 835 (8th Cir. 1983) (discussing courts' "repeated[] refus[al] to read a specific intent

28

requirement into . . . firearms statutes").

Mr. Ledford's third argument, that a lack of intentionality language improperly converts § 922(g)(1) into a general intent offense, is baseless. Congress may criminalize knowing acts committed without specific intent. *See United States v. Matthews*, 209 F.3d 338, 350-52 (4th Cir. 2000) (ruling in child pornography case that criminalization of knowing conduct without proof of specific intent or willfulness does not violate due process); *United States v. Blair*, 54 F.3d 639, 641-42 (10th Cir. 1995) (holding that a statute that prohibited "knowingly" using a wire communication facility to engage in the business of betting or wagering did not require proof of specific intent; Congress' use of term "knowingly" indicated a general intent offense).

Fourth, Mr. Ledford claims that the instruction the court gave was invalid because it did not include language requiring a "nexus" between the defendant and the firearm. He is right that a nexus is necessary in cases of joint occupancy. *Mills*, 29 F.3d at 549. However*, Colonna* squarely forecloses his argument that nexus is lacking here: we made it clear that knowledge and access together are sufficient to show nexus, and the jury was instructed on that principle. *See Colonna*, 360 F.3d at 1179; *see also Norman*, 388 F.3d at 1340-41 (quoting *Colonna*).

Although Mr. Ledford asserts that, in *Mills*, knowledge and access were

29

insufficient to prove constructive possession, the evidence was different in that case. There, the government failed to show sufficient evidence of constructive possession when the defendant had placed guns in the garage of a residence six days prior to the guns being found in the dining room. *Mills*, 29 F.3d at 550. We held the government did not come forward with the necessary evidence to connect Mr. Mills with knowing constructive possession of the firearms beyond his handling them on the prior date. Mere dominion or control over the dining room was insufficient to establish constructive possession. *Id.*

In this case, however, Ms. Carey told Deputy Brodheim that the gun belonged to Mr. Ledford and subsequently led Deputy Brodheim to the dresser in which it was found. Mr. Ledford later told a bail bondswoman and Deputy Brodheim that he knowingly possessed the gun. This combination of evidence provided the sufficient nexus in our case. While we leave open the possibility that there may be a future case in which the specific facts require a harder look at the nexus requirement, we conclude that a sufficient nexus existed here to establish constructive possession.

Mr. Ledford's final argument is that the jury instructions in this case should have included intent language because the Tenth Circuit Proposed Criminal Pattern Jury Instructions contain such language. We acknowledge that the proposed pattern instructions include both the intentionality language proposed by

Mr. Ledford and the following optional paragraph:

> In addition, momentary or transitory control of an object, without criminal intent, is not possession. You should not find that the defendant possessed the object if he possessed it only momentarily, and either did not know that he possessed it or lacked criminal intent to possess it.

TENTH CIRCUIT PROPOSED PATTERN CRIMINAL JURY INSTRUCTION No.1.31,

*Actual or Constructive Possession.*

Nevertheless, for a number of reasons, Mr. Ledford's argument must fail. The Proposed Instructions had not been adopted at the time of trial in this case; they were in the comment period until December 31, 2004. Moreover, a proposed pattern jury instruction is not legal authority. *See United States v. Burke*, 781 F.2d 1234, 1239 n.2 (7th Cir. 1985) ("Although the pattern instructions are suggestive rather than absolutely binding, a decision of this court is authoritative."). Additionally, the Resolution accompanying the Proposed Instructions provides that the inclusion of each instruction "shall not be construed as adjudicative approval of the content of such instruction, which must await case-by-case review by the Court." 10th Cir. Proposed Pattern Criminal Jury Instructions, *Resolution of the Judicial Council of the Tenth Circuit.* In *Colonna*, we provided exactly that. Finally, we note that the proposed pattern jury instruction on which Mr. Ledford relies has been changed, and it is now

31

consistent with *Colonna*.[1]

## III.   CONCLUSION

For the foregoing reasons, the district court did not err in admitting Deputy

Brodheim's testimony, or in giving the "possession" jury instruction.  We

therefore **AFFIRM** Mr. Ledford's conviction.

---

[1]  The pattern instruction now reads:

A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion and control over an object, either directly or through another person or persons, is then in constructive possession of it.

10th Cir. Pattern Criminal Jury Instruction No. 1.31 (2005) (updated, Feb. 8, 2006).