N.R. SMITH, Circuit Judge,
dissenting:
In its opinion, the majority fails to correctly construe the hearsay rule and fails to give the proper deference to the district court’s other evidentiary rulings. I must therefore dissent because:
1. Assuming (but not deciding) that a de novo standard of review applies when determining whether a statement is hearsay, the majority fails to properly construe the hearsay rule. Under the hearsay rule, statements asserting a declarant’s beliefs are hearsay, if offered to prove the declarant’s belief or offered for a purpose that *984 requires the declarant to believe the matters asserted are true. Therefore, the district court did not err in concluding that Yvon Wagner’s testimony was hearsay.
2. The majority fails to apply the “substantially deferential” abuse of discretion test, recently elucidated by our en banc panel in United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir.2009) (en banc), for the remaining evidentiary issues appealed here. Though an appellate jurist may have ruled differently on these issues, “we may not simply substitute our view for that of the district court, but rather must give the district court’s findings deference.” Id.
I.

STANDARD OF REVIEW

This circuit’s case law is not entirely clear regarding whether we review de novo a district court’s decision that a statement is or is not hearsay. Compare United States v. Stinson, 647 F.3d 1196, 1210 (9th Cir.2011) (‘We review a district court’s evidentiary rulings for abuse of discretion.”), and United States v. Tran, 568 F.3d 1156, 1162 (9th Cir.2009) (applying an abuse of discretion standard in determining whether a statement is hearsay under Rule 801), with Mahone v. Lehman, 347 F.3d 1170, 1173-74 (9th Cir.2003) (“We review the district court’s construction of the hearsay rule de novo.... ” (quoting Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir.2002))), United States v. Collicott, 92 F.3d 973, 978-82 (9th Cir.1996) (holding that the district court erred, because the statements at issue were hearsay and not admissible under Rule 801(d)(1)(B), never mentioning whether the district court abused its discretion, but rather seems to have reviewed the hearsay determination de novo), and United States v. Warren, 25 F.3d 890, 894-95 (9th Cir.1994) (held that the statements at issue were admissible under Rule 801(d)(2)(A) because they were not hearsay, "with no mention of an abuse of discretion).
The Second Circuit and Sixth Circuit have held that a district court’s determination whether a statement is hearsay is reviewed de novo. United States v. Ferguson, 653 F.3d 61, 86 (2d Cir.2011); Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 378-381 (6th Cir.2009). But see Trepel v. Roadway Exp., Inc., 194 F.3d 708, 716-17 (6th Cir.1999) (“Therefore, in disregard of our heretofore well-settled precedent that hearsay evidentiary rulings are reviewed de novo, we shall review the district court’s ruling for an abuse of discretion.” (citation omitted)).
We review the district court’s remaining evidentiary rulings for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). We do not reverse evidentiary rulings unless the rulings are “manifestly erroneous and prejudicial.” Orr, 285 F.3d at 773. “This includes the exclusion of evidence under a hearsay rule.” Stinson, 647 F.3d at 1210. We also review the district court’s handling of closing arguments for an abuse of discretion. United States v. Lazarenko, 564 F.3d 1026, 1043 (9th Cir.2009).
Our circuit employs a “significantly deferential” two-step test to determine whether a district court abused its discretion. Hinkson, 585 F.3d at 1262. The first step “is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested.” Id. If so, the second step “is to determine whether the trial court’s application of the correct legal standard was (1) ‘illogical,’ (2) ‘implausible,’ or (3) without ‘support in inferences that may be drawn from the facts in the record.’ ” Id. (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 577, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). *985 “If any of these three apply, only then are we able to have a ‘definite and firm conviction’ that the district court reached a conclusion that was a ‘mistake’ or was not among its ‘permissible’ options, and thus that it abused its discretion by making a clearly erroneous finding of fact.” Id. In other words, “we do not automatically reverse a district court’s factual finding if we decide a ‘mistake has been committed.’” Id. at 1263.
II.

WAGNER’S TESTIMONY

The majority first concludes that the district court erred by excluding testimony from Vogel’s sister, Yvon Wagner, regarding statements made by Vogel (who was deceased before trial).[1] Wagner would have testified regarding Vogel’s thoughts and beliefs during the dress-out procedure based on statements Vogel purportedly made — after the fact — to Wagner. The majority finds that the district court erred, apparently as a matter of law, no matter whether the standard of review is de novo or abuse of discretion. The majority erroneously concludes that Wagner’s testimony was not offered to prove what Vogel asserted.
A. Wagner’s testimony was hearsay evidence
The Estate argues that Wagner’s testimony was not hearsay, because it was not offered to prove the details of the dress-out procedure (i.e., that Vogel was actually raped). Instead, the Estate argues that Wagner’s testimony was offered to show Vogel’s state of mind following the dress-out procedure and the lasting impact the event had on Vogel following his release. The majority asserts that Wagner “was not asserting the truth of anything that Vogel said had happened to him in jail.” Maj. Op. at 980. I disagree with both. Wagner’s testimony was offered to prove the truth of the matter asserted — i.e., that Vogel believed the events he described happened. The district court did not incorrectly construe or apply the hearsay rule.
Hearsay “is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Fed.R.Evid. 801(c). The majority agrees that, if Wagner’s testimony — including Vogel’s statements that (1) he was forcibly undressed by detention officers, (2) he was dressed in pink underwear and slippers, (3) the officers “manhandled” him on the floor of his jail cell, and (4) he called out to other inmates for help — were offered for the truth of the matter asserted, it would be hearsay. Even if this information were consistent with other evidence in this case, it could not be proven by Wagner using hearsay evidence.
However, the Estate and the majority assert that Wagner’s testimony is not offered to prove the “truth of anything that Vogel said had happened to him in jail.” Maj. Op. at 980. That assertion may be true, but it is not focused on Wagner’s statements. For example, Wagner testified that Vogel (1) “felt he was being raped,” (2) “felt one of the officers attempted to put his penis in his mouth,” (3) “believed he was being raped,” and (4) “believed the pink underwear was used to *986 put him in [a] vulnerable position with these officers.” Wagner’s testimony is offered to prove the truth of what Vogel asserted — i.e., that he believed what he described occurred. A statement is hearsay if offered to prove the truth of the matter asserted. Focusing on Wagner’s statements, they are hearsay, because they were offered to show that Vogel actually believed the facts asserted. 30B Michael H. Graham, Federal Practice & Procedure § 7044 (interim ed.2000) (explaining that second-hand statements of belief are hearsay, but may be admissible under Rule 803(3)’s exception to the hearsay rule). Further, the statements are hearsay, because it must be proven that Vogel believed the matters asserted were true for the Estate’s mental state argument to succeed. Id. § 7006 (“If the declarant must believe the matter asserted to be true for any inference to logically flow, ... the hearsay risks of sincerity and narration are present. Such statements are thus properly classified as hearsay.”). The Estate never made an offer of proof to demonstrate that the proffered testimony complied with the hearsay rule. Therefore, the district court’s determination (that Wagner’s testimony was hearsay) was not erroneous and the district court did not misconstrue the hearsay rule.
B. Wagner’s testimony did not fall under Rule 803(3)’s then-existing state of mind exception to the hearsay rule
The Estate argues that, even if Wagner’s testimony were hearsay, it was admissible as evidence under the state of mind exception in Federal Rule of Evidence 803(3). The majority agrees. However, the district court disagreed and, because this is a discretionary decision, we must afford the district court’s decision substantial deference. Here, the district court’s determination that Wagner’s testimony regarding Vogel’s post-release statements did not fall under Rule 803(3)’s state of mind exception was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. The statements (1) were statements of memory or belief made at least one week after the events at issue; and (2) were offered not simply to demonstrate Vogel’s present mental condition but his past mental condition (i.e., that he was agitated), and also to explain why he was agitated (i.e., that he believed he was being raped). Therefore, although we may have decided this issue differently, the district court did not abuse its discretion.
Rule 803(3) creates an exception to the hearsay rule for “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed ----” Fed.R.Evid. 803(3) (2010) (emphasis added). Vogel’s statements do not meet Rule 803(3)’s foundational requirements of “contemporaneousness, [lack of] chance for reflection, and relevance.” United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir.1980), overruled on other grounds by United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc). Vogel explained the dress out procedure to his family following his release from jail, which was at least seven days after the procedure took place. These were “statements] of memory,” which are expressly prohibited under Rule 803(3). The Rules of Evidence exclude statements of memory, because “[t]he more time that elapses between the declaration and the period about which the declarant is commenting, the less reliable is his statement. ... The state of mind declaration also has probative value, because the de *987 clarant presumably has no chance for reflection and therefore for misrepresentation.” Ponticelli, 622 F.2d at 991. Vogel conceivably could have misrepresented what happened at the jail (or what he believed happened) to explain or justify his unruly conduct with the officers. Thus, although detention officers’ testimony about what Vogel said during the dress-out procedure is admissible (given its contemporaneity), Vogel’s statements a week or two after the fact do not provide the same probative value contemplated by the exception in Rule 803(3). See United States v. Miller, 874 F.2d 1255, 1265 (9th Cir.1989) (holding that hearsay statements made less than 24 hours after an event did not meet the contemporaneity and lack of reflection requirements under Rule 803(3)).
Additionally, Wagner’s statements were offered to show not only that Vogel was agitated during the dress-out procedure, but also why he was agitated. Such use of Wagner’s statements is not permitted under Rule 803(3), as interpreted by our circuit. We stated in United States v. Emmert that “the state-of-mind exception does not permit the witness to relate any of the declarant’s statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind.” 829 F.2d 805, 810 (9th Cir.1987) (emphasis added) (quoting United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir.1980)); see also id. (“[Rule 803(3) ] ... narrowly limit[s] admissible statements to declarations of condition— ‘I’m scared’ — and not belief — ‘I’m scared because [someone] threatened me.’ ” (emphasis altered) (internal quotation marks omitted)). We reaffirmed the validity of Emmert in United States v. Fontenot by holding that hearsay statements did not fall under the exception in Rule 803(3), because the statements related why the declarant held the particular state of mind. United States v. Fontenot, 14 F.3d 1364, 1371 (9th Cir.1994). -The Fifth Circuit and Tenth Circuit also do not allow statements that identify why the declarant has the particular state of mind. See, e.g., United States v. Liu, 960 F.2d 449, 452 (5th Cir.1992) (holding that “[e]vidence of ... fear was admitted,” but “[p]roperly excluded were the alleged reasons for that fear” (citing Cohen, 631 F.2d at 1225)); United States v. Ledford, 443 F.3d 702, 709-10 (10th Cir.2005) (“The phrase ‘because the defendant threatened me’ is expressly outside the state-of-mind exception because the explanation for the fear expresses a belief different from the state of mind of being afraid.”).
The majority contends that we made it clear in Emmert “that the bar applies only when the statements are offered to prove the truth of the facts underlying the memory or belief.” Maj. Op. at 981. However, in Emmert and Fontenot, we did not indicate that our decisions hinged on the declarant offering the reasons for the belief in order to prove the events believed. Rather, our decisions identified the reason for the exclusion to be that the “testimony would have fallen within the ‘belief category and would not have been limited to [the declarant’s] current state of mind.” Emmert, 829 F.2d at 810; see also Fontenot, 14 F.3d at 1371 (noting that “the statements would have demonstrated that [.Fontenot ] believed his and Cathy Fontenot’s lives were in danger” (alterations in original)).
Here, Wagner intended to testify that Vogel was agitated, because he believed he was being raped and the officers were dressing him in pink underwear for a sex party. This testimony was central to the Estate’s theory of causation that Vogel’s traumatic experience in jail caused his fatal arrhythmia several weeks later. For these reasons, and in light of our case law, *988 the district court’s application of Rule 803(3) to the facts of this case was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record. The district court did not abuse its discretion.
C. Wagner’s testimony lacked foundation
The majority also determines that the district court abused its discretion in concluding that Wagner lacked personal knowledge about Vogel’s mental condition during the jailhouse dress-out procedure. However, the majority again fails to give any deference to the district court’s decision. Federal Rule of Evidence 602 provides that a “witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness’ own testimony.” (emphasis added). The majority claims Wagner had adequate foundation, because she had personal knowledge of her conversation with Vogel and perceived his emotions. The majority claims Vogel’s statements went to establish “his state of mind at the time of the conversation.... ” Maj. Op. at 981. If Wagner’s testimony were only offered to prove Vogel’s temperament during his conversation with Wagner, the majority would be correct.
However, Wagner intended to offer various opinions regarding Vogel’s state of mind while in jail and why he reacted the way he did during the dress-out procedure. For example, Wagner, testified that (1) Vogel “believed he was being raped,” (2) Vogel “believed the pink underwear was used to put him in [a] vulnerable position,” (3) Vogel hid under his bed to protect himself because he was “paranoid” and “felt he was in extreme harm’s way,” and (4) “this was very, I’m sure, frightening for him.” The Estate’s entire theory of liability turns on the purportedly indelible trauma Vogel endured during his stay at the county jail. Thus, there is no doubt that Wagner offered this testimony to prove what Vogel felt and believed while he was in jail — not how he felt as he described the jailhouse incident a week later. To be sure, the County objected to Wagner’s testimony, not because Wagner failed to establish that she actually had a conversation with Vogel, but because Wagner lacked foundation to testify about the thoughts and beliefs of her floridly psychotic brother during the jailhouse incident. For these reasons, we cannot conclude that the district court abused its discretion in excluding this testimony, in part, because of lack of foundation. Its determination was not illogical, implausible, or without support in inferences that may be drawn from the facts in the record.
III.

EXPERT TESTIMONY

A. The district court did not abuse its discretion by excluding Dr. Daniel Spitz’s expert testimony
Neither party disputed Dr. Spitz’s preliminary conclusions that (1) Vogel’s death was caused by acute cardiac arrhythmia, and (2) people with severe schizophrenia have an increased chance of dying from cardiac arrhythmia. The district court excluded Dr. Spitz’s testimony, because there was no reliable scientific basis for his supplemental conclusion that Vogel’s dress-out experience at the county jail caused his cardiac arrhythmia three weeks later. The majority concludes that the district court erred in excluding Dr. Daniel Spitz’s testimony. I disagree.
Under Daubert v. Merrell Dow Pharmaceuticals, Inc., a court must determine *989 whether an expert is “proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.” 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This analysis “entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Id. Among other things, a court should consider (1) whether a theory or technique “can be (and has been) tested,” (2) “whether the theory or technique has been subjected to peer review and publication,” (3) “the known or potential rate of error,” and (4) whether it is generally accepted in the scientific community. Id. at 593-94, 113 S.Ct. 2786. After examining Dr. Spitz’s deposition testimony, the district court determined that the scientific theories underlying his proposed testimony did not satisfy the standards in Daubert. The Estate failed to demonstrate that Dr. Spitz’s three-week-later causation theory (1) could be or had been tested, (2) had been subjected to peer review or publication, or (3) was generally accepted in the scientific community. It was also unclear what evidence Dr. Spitz considered when forming his opinion and whether he considered all of the relevant evidence in the case.
In addition to the district court’s findings above, Dr. Spitz admitted that he (1) did not interview any witnesses, (2) did not consult any relevant treatises or literature, and (3) only had experience investigating the deaths of possibly four or five schizophrenics where the cause of death was acute arrhythmia. Dr. Spitz also based his opinion, in part, on statements from Vogel’s relatives (which the court deemed unreliable and inadmissible) and what he termed “common sense.” Further, although Dr. Spitz testified that the dress-out procedure played a role in Vogel’s death, he could not explain why other events — such as the car accident immediately preceding Vogel’s death — had not caused acute arrhythmia earlier, explaining that “[w]hy [Vogel] died when he did is something probably nobody knows.”[2]
Plainly stated, Dr. Spitz’s general qualifications as a medical examiner do not provide him license to speculate regarding the environmental — as distinct from the medical — factors that caused Vogel’s death. Dr. Spitz provided no scientific theory or method that could substantiate his purportedly “common sense” idea that the jailhouse dress-out procedure three week earlier was the cause of Vogel’s heart arrhythmia. Though Dr. Spitz could testify to the medical causes of Vogel’s death, his speculation as to which of the many environmental stressors in Vogel’s life “likely” or “probably” caused death did not meet Daubert’s threshold standard for scientifically valid reasoning or methodology. Given the many glaring deficiencies in Dr. Spitz’s proposed testimony, the district *990 court’s ruling cannot be an abuse of discretion.
B. The district court did not abuse its discretion by excluding portions of Dr. Phillip Esplin’s expert testimony
The majority concludes that the district court abused its discretion in excluding certain portions of the expert testimony of Dr. Phillip Esplín. The district court determined that Dr. Esplin’s testimony was (1) “[unjsupported by evidence;” (2) wholly “uncredible,” because, by Dr. Esplin’s own admission, no one can know what a floridly psychotic person was thinking; (3) lacking foundation; (4) “more prejudicial than probative;” and (5) going to “puzzle” the jury. Given these deficiencies, I cannot say the district court’s ruling was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.
The majority’s cursory treatment of the district court’s ruling on Dr. Esplin’s testimony never explains how the district court applied an erroneous legal standard or relied on a clearly erroneous finding of fact. No reliable evidence in the record — apart from Wagner’s testimony — supported Dr. Esplin’s claim that Vogel thought the pink coloring of the jail-issued underwear was significant. Dr. Esplín himself admitted that no one could know or understand what was going on inside the mind of a floridly psychotic schizophrenic, suggesting that, even with Wagner’s testimony, his testimony on causation would be purely speculative. Given these foundation and methodological deficiencies, the district court acted within its discretion to exclude this testimony under Federal Rules of Evidence 702 and 703.
IV.

CLOSING ARGUMENT

Lastly, the majority hastily concluded that the district court abused its discretion by denying the Estate a rebuttal closing argument at trial. However, the majority never explains what law gives a plaintiff in the District of Arizona an inalienable right to rebuttal argument, much less how the district court abused its discretion in shaping closing arguments under District of Arizona Local Rule 39.1(d). Rule 39.1(d) guarantees a “right to close” to the party bearing the burden of proof, but that rule has never been defined to provide the right to speak last. The district court permitted the Estate to make a “thorough,” 60-minute closing argument. Following a short recess, the court explained to counsel that “[t]he closing is going to end with [the County], There isn’t going to be any rebuttal. I just did a little research, it’s discretionary.[The Estate] had a thorough, complete effort at it, and [the County] is entitled to that as well. But we’re not going to have a rebuttal.” The court also noted, “I don’t think there was anything that [the Estate] could have touched on that [the Estate] didn’t explore, several times.”
It is well established that a “trial court has broad discretion in controlling closing arguments.” United States v. Spillone, 879 F.2d 514, 518 (9th Cir.1989); accord Fernandez v. Corporacion Insular De Seguros, 79 F.3d 207, 209-10 (1st Cir.1996) (“The decision to permit rebuttal [in a civil action] is a 'procedural matter which rests within the sound discretion of the trial judge and rarely (if ever) provides fertile ground for appeal.” (internal citation omitted)). Because the Estate closed with a 60-minute argument pursuant to Rule 39.1(d), the district court did not abuse its “broad” discretion in denying the Estate a rebuttal closing argument.
I would therefore affirm.

. Wagner would have testified that Vogel (1) said the detention officers dressed him in "pink underwear, in pink slippers and, again, at his expense they were accosting him” during the dress-out procedure; (2) believed he had been raped; (3) "felt one of the officers attempted to put his penis in his mouth and that he had to keep his mouth so tight that he bruised his outer lips to avoid being accosted that way,” and (4) believed the officers used the pink underwear to put him in a vulnerable position before a planned sex “party.”

. Other experts concurred in this assessment. For example, when asked about the possibility that the dress-out incident had some influence on the arrhythmia, Dr. Ira Ehrlich responded, "Anything is possible. Of course it’s possible.” When asked again whether Vogel may have been obsessing about the jail incident when he died, Dr. Ehrlich explained, "He could have. I would certainly not ever dismiss that as a possibility. I just don’t see how anybody can point at that one incident and say that’s what did it; in all likelihood, medical certainty, that’s what did it. I think that’s impossible.” Dr. Ehrlich also expressed serious doubts about anyone's "ability to say, with any degree of certainty, what was going on in Mr. Vogel's brain at the time that he developed his fatal arrythmia[J ... Mr. Vogel’s brain is a salad bowl of stuff that has been tossed — unkindly perhaps, but — tossed so that there is no organization there whatsoever.”