FILED
United States Court of Appeals
Tenth Circuit

September 14, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

ROBERT ANDREW BLECHMAN,

     Defendant - Appellant.

No. 10-3034

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:08-CR-40008-JAR-2)

Christopher M. Joseph (Stephen M. Joseph with him on the briefs), Joseph & Hollander, P.A., Topeka, Kansas, for Defendant-Appellant.

Christine E. Kenney, Assistant United States Attorney (Barry R. Grissom, United States Attorney, and James A. Brown, Assistant United States Attorney, with her on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **MURPHY, EBEL,** and **HARTZ,** Circuit Judges.

**EBEL**, Circuit Judge.

In January 2009, Defendant-Appellant Robert Andrew Blechman and a

codefendant, Itsik ("Issac") Yass, were tried together in the District of Kansas on charges

of mail fraud, aggravated identity theft, and conspiracy to commit mail fraud and aggravated identity theft.  Evidence introduced at trial showed that Yass operated a business that he used to temporarily halt home foreclosures by "attaching" foreclosure properties to fraudulent bankruptcy cases in order to take advantage of the Bankruptcy Code's automatic stay provision.  Several different pieces of evidence connected Blechman to Yass's scheme, including e-mails sent from "rablechman@aol.com" to Yass, Public Access to Court Electronic Records ("PACER") records suggesting that Blechman accessed fraudulent bankruptcies using both Yass's PACER account and his own PACER account, postal money orders that Blechman filled out and mailed to bankruptcy courts to pay filing fees on behalf of fictitious debtors, and Yass's trial testimony explaining Blechman's role in the scheme.  After a two-week trial, the jury found Blechman and Yass guilty of all of the counts charged against them.  The district court granted Blechman's motion for judgment of acquittal on the identity theft counts and ultimately sentenced Blechman to a total of eighteen months' imprisonment on the remaining counts.

Blechman now appeals, challenging the district court's admission of an America Online ("AOL") record that connected him to the e-mail address "rablechman@aol.com" and three PACER records revealing that he accessed fraudulent bankruptcy cases in Tennessee that were similar to the Kansas bankruptcies identified in the indictment. Blechman argues that these records contained double hearsay and that the district court erroneously admitted them under the business records exception to the hearsay rule.  See

2

Fed. R. Evid. 803(6).  Exercising jurisdiction under 28 U.S.C. § 1291, we hold that the

district court erred in admitting the challenged AOL and PACER records under Rule

803(6).  Nevertheless, because we conclude that the error was harmless, we AFFIRM

Blechman's convictions.

## I.      BACKGROUND

On June 11, 2008, a federal grand jury in Kansas returned a thirteen-count first

superseding indictment against Defendant-Appellant Robert Blechman and Issac Yass.

The indictment charged both defendants with conspiracy to commit mail fraud and

aggravated identity theft, in violation of 18 U.S.C. § 371 (Count 1); mail fraud, in

violation of 18 U.S.C. §§ 2 and 1341 (Counts 2–7); and aggravated identify theft, in

violation of 18 U.S.C. §§ 2 and 1028A (Counts 8–13).  In January 2009, Blechman and

Yass were tried together in a two-week jury trial in the District of Kansas.  In this section,

we detail the trial proceedings that are relevant to the evidentiary issues raised in this

appeal.

## A.      Overview of the Foreclosure Stopping Scheme

At trial, Yass admitted to operating a California-based business named Stopco, the

sole purpose of which was to temporarily stop foreclosure sales on homes.  Yass would

obtain public information about financially troubled homeowners who had received

notice from their lenders that they were in default under deeds of trust and that their

properties were subject to foreclosure.  Yass would then solicit these homeowners by

3

sending them a letter stating that he could help them keep their properties for up to two years for a monthly fee of $499.99.

When homeowners responded to Yass's solicitation, he would follow up by sending an information package explaining his services and containing thank you letters from previous customers. The package informed prospective customers that

> [w]e attach your Property, (NOT your name) to an EXISTING BANKRUPTCY, and TEMPORARILY, (ONE TO TWO (2) YEARS) buy you more time.
>
> You, yourself, NEVER need to file for Bankruptcy!
>
> We email you documents, along with instructions, you file them, fax back to us, we get you about ONE MONTH, and we repeat this process monthly!

(Record on Appeal ("ROA"), vol. XI at 86 (Gov't Ex. 1-VVV – Stopco information package).) The package also told customers how to deposit Yass's initial fee into a Wells Fargo checking account held in the name of Stopco.

In order to stop foreclosures, Yass would "attach" his clients' properties to bankruptcy cases that were filed in the District of Kansas in the names of fictitious individuals who purported to be doing business as fictitious companies ("DBAs"). Yass accomplished this by preparing a Short Form Deed of Trust conveying a partial interest in the foreclosure property to a DBA in one of the fraudulent bankruptcy cases. The homeowner would then execute the Short Form Deed of Trust and file it with the appropriate county recording office. After receiving a stamped copy of the deed from the homeowner, Yass would fax a copy of the Short Form Deed of Trust, along with a copy

4

of the Notice of Bankruptcy Filing for the case involving the DBA listed in the deed, to the person in charge of the foreclosure sale.  Because the Bankruptcy Code provides for an automatic stay of all collection efforts against property of the bankruptcy estate during the pendency of a bankruptcy case, see 11 U.S.C. § 362(a), the creditor would cancel the foreclosure sale upon receipt of the documents from Yass showing that an entity in bankruptcy held an interest in the property.  The Government identified eleven fraudulent bankruptcy cases in the District of Kansas that Yass used to carry out this scheme, although in two of those cases the petitions were intercepted before they were filed.

**B.      Evidence Connecting Blechman to the Scheme**

Both the Government and Yass, as part of his defense, offered various types of evidence to prove that Blechman played a role in the foreclosure stopping scheme.

**1.      AOL Record, Yahoo! Record, and E-mails Between Yass and "rablechman@aol.com"**

**a.      Exhibit 1-BBB – The AOL Record**

Early in the trial, the Government sought to introduce an AOL account record, Exhibit 1-BBB, through Patricia Johnson, an investigator with AOL.  The purpose of the exhibit was to "show[] that an individual using the screen name 'Rablechman' who listed a name and address of 'Robert Blechman, 10736 Jefferson Blvd., Culver City, CA 90230' established an account with AOL."  (Aple. Br. at 11–12; see also Aplt. Br. at 17 (stating that the purpose of the exhibit was "to link the email address 'rablechman@aol.com' to Blechman").)  Exhibit 1-BBB consisted of three pages.  The

5

first page showed that someone using the screen name "rablechman" logged on to AOL on December 5, 2008, from a Cox Communications IP address. The second page indicated that the screen name "rablechman" was associated with a free AOL account. This page also featured a description of free AOL accounts, which read, in part, "Registration information is recorded but not verified. Fictitious names and addresses are common." (ROA, vol. XI at 13 (Gov't Ex. 1-BBB – AOL account information for "rablechman").) The third page contained registration information for the account corresponding to the screen name "rablechman." This page showed that the account was created on May 20, 1998, and that the account was registered to Robert Blechman in Culver City, California.

Johnson testified that Exhibit 1-BBB was an AOL record kept in the regular course of business, made at or near the time of the information recorded, and made by a person with knowledge of AOL's business. She also testified that AOL regularly records the activity reflected in Exhibit 1-BBB and creates reports of that activity. When questioned by defense counsel, however, Johnson admitted that AOL did not verify who originally input the "subscriber information" contained on the third page of the exhibit and that it could have been "anybody in the world who could access a computer." (Id. vol. V at 329.) For this reason, Blechman objected to admission of Exhibit 1-BBB on hearsay grounds. But the district court overruled the objection, concluding that the exhibit fell within the business records exception to the hearsay rule set forth in Federal Rule of Evidence 803(6).

6

### b.     Exhibit 1-AAA – The Yahoo! Record

Immediately after the district court admitted Exhibit 1-BBB, the Government called Yahoo! employee Tracy Hart.  The Government used Hart to introduce Exhibit 1-AAA, a Yahoo! record containing information about two accounts with the log-in names "stopco" and "rablechman," respectively.   This record established that Yass had two e-mail accounts with Yahoo!: "StopCo@yahoo.com" and "iyy101@yahoo.com."  (ROA, vol. V at 349–51; id. vol. XI at 1–2 (Gov't Ex. 1-AAA – Yahoo! account management tool for "stopco").)  It also showed that Blechman had a Yahoo! e-mail address, "rablechman@yahoo.com," and an alternate e-mail address, "rablechman@aol.com."[1] (Id. vol. V at 352–53; id. vol. XI at 9–10 (Gov't Ex. 1-AAA – Yahoo! account management tool for "rablechman").)  The district court admitted Exhibit 1-AAA without objection.

### c.     E-mails Between Yass and "rablechman@aol.com"

Later in the trial, the Government introduced a series of e-mail exchanges between Yass (using his e-mail address "iyy101@yahoo.com") and the AOL e-mail address "rablechman@aol.com" that took place between June 6, 2006, and August 6, 2007. Collectively, these e-mails tended to show that whoever was using the e-mail address

---

[1] Interestingly, Exhibit 1-AAA indicated that the "rablechman" Yahoo! account was registered to a Ms. Robert Blechman in Culver City, California.  Furthermore, whoever originally registered the account purported to be a female.  Neither party has attempted to explain this oddity, but it appears to be irrelevant for our purposes since no one disputes that Blechman was the owner of the "rablechman" Yahoo! account.

7

"rablechman@aol.com" was an active participant in Yass's scheme. For instance,

"rablechman@aol.com" answered Yass's questions pertaining to deeds and trustee's

sales, provided the website address where Yass could sign up for a PACER account, and

supplied Yass with documents such as a revised Short Form Deed of Trust. Each e-mail

from "rablechman@aol.com" featured the following electronic signature block:

> Robert A. Blechman – Real Estate Agent & Financing Specialist; Case Manager & Paralegal
> American Realty & Financial Services; and,
> Michael N. Sofris, A Professional Law Corporation
> 10736-666 Jefferson Boulevard – Culver City, California 90230-4969 [or 90230-4933]
> Telephone (310) 945-5924 – Facsimile (310) 362-0307 – E-Mail: rablechman@aol.com

(ROA, vol. XI at 32–55 (Gov't Exs. 1-FFF, 1-GGG, 1-HHH, 1-III, 1-JJJ, 1-KKK, 1-LLL,

1-MMM, 1-NNN, and 1-OOO).)[2] Blechman objected to these e-mails on the grounds

that any statements by Yass in the e-mail chains were not admissible against Blechman as

party admissions. The district court gave a limiting instruction to address Blechman's

concern,[3] and Blechman made no further objections (although he did continue his

---

[2] In his Opening Brief, Blechman states that he was employed as a legal assistant to Michael Sofris, a California attorney.

[3] The district court's instruction provided, in pertinent part, as follows:

Now, ladies and gentlemen of the jury, this exhibit [1-GGG] is an e-mail from someone using an address that I think the evidence shows belongs to Mr. Yass. There's—there's e-mails back and forth. And I think this one is an e-mail message from Mr. Yass or someone using Mr. Yass' e-mail and then a response e-mail from Mr. Blechman or somebody using Mr. Blechman's e-mail account.

Now, Mr. Yass' e-mail to Mr. Blechman are statements by Mr. Yass. You can consider . . . what Mr. Yass says against Mr. Yass, but you can't

8

original objection).  Accordingly, the district court admitted all of the e-mails offered by the Government.

Near the end of the trial, Yass took the stand in his own defense.  On cross-examination of Yass, Blechman's counsel introduced a different series of e-mails between Yass and "rablechman@aol.com."  Some of the e-mails from "rablechman@aol.com" included attachments or links with materials relevant to California real estate practice and foreclosure law.  Others referenced apparently unrelated business transactions.  Blechman's counsel elicited testimony from Yass that Yass received each of these e-mails from Blechman.  The purpose of the e-mails was to show that Blechman was merely providing accurate legal advice to Yass rather than participating in an unlawful scheme.[4]

---

> consider it against Mr. Blechman.  Conversely, the response e-mail from Mr. Blechman, statements by Mr. Blechman, you can consider what Mr. Blechman says against him . . . .  You can't consider what Mr. Blechman says against the interest of Mr. Yass.

(ROA, vol. V at 719.)  Blechman did not object to this instruction.

[4] For example, before introducing one of the e-mails, Blechman's counsel questioned Yass as follows:

> Now we were talking about your relationship with Mr. Blechman and Mr. Sofris.  Mr. Blechman gave you some simple legal advice, didn't he? . . . Your legal assistant essentially? . . . And as part of that role, he gave you advice about what was legal and what was not legal in the foreclosure business, right?

9

## 2. PACER Records and Fraudulent Tennessee Bankruptcy Cases

### a. Blechman's Use of Yass's PACER Account

The Government's evidence demonstrated that Yass used the PACER system to assist in carrying out the scheme to stop foreclosures.[5] PACER records admitted over Blechman's relevancy objection[6] established that Yass registered for a PACER account on June 6, 2006,[7] and was assigned account "ISO725." These records also showed that account "ISO725" searched all eleven of the fraudulent Kansas bankruptcy cases.

---

(ROA, vol. V at 1514.) When explaining the relevance of this same e-mail to the judge, Blechman's counsel stated,

> Mr. Yass is testifying that Mr. Blechman is engaging in this fraud, yet at the same time he is providing him E-mails about the law that sets out exactly what a foreclosure consultant can do and cannot do . . . . And so Mr. Blechman is providing him information about what he legally can do and what he legally cannot do, which is completely inconsistent with the idea that he is just this fraudster ignoring the law.

(Id. at 1516.)

[5] PACER "is an electronic public access service that allows users to obtain case and docket information from federal appellate, district and bankruptcy courts." PUBLIC ACCESS TO COURT ELECTRONIC RECORDS, http://www.pacer.gov/ (last visited Aug. 2, 2011).

[6] Blechman objected that the records, which related only to Yass's PACER account, were irrelevant as to Blechman unless the Government could establish a conspiracy between Blechman and Yass. The district court determined that the records were not being offered as coconspirator statements and overruled the objection. Blechman does not appeal that ruling.

[7] On that same day, Yass received a blank e-mail from "rablechman@aol.com" with the PACER website address in the subject line.

According to Edward Walsh, a senior analyst with the United States Trustee's office, Yass needed PACER to access the Notices of Bankruptcy Filing in the fraudulent cases because the notices could not be mailed to the invalid addresses listed for the fictitious debtors in the bankruptcy petitions.

Yass was arrested on February 28, 2008. But the Government introduced a PACER record, Exhibit 21, showing that someone using account "ISO725" accessed three of the Kansas bankruptcy cases on March 2, 2008, from IP address 76.87.252.123.[8] This same IP address was associated with Blechman's Yahoo! account—specifically, Exhibit 1-AAA revealed that someone logged in to the "rablechman" Yahoo! account from this IP address five times between January 29, 2008, and August 26, 2008. Moreover, Yass testified that he provided Blechman with his PACER password and that he had an agreement with Blechman whereby Blechman would use PACER to monitor the bankruptcy cases.

### b. Blechman's Connection to Fraudulent Bankruptcy Cases in Tennessee

The Government also introduced evidence showing that Blechman's mother mailed two bankruptcy petitions to the U.S. Bankruptcy Court for the Western District of Tennessee and that Blechman later used his own PACER account to access one of these cases, in addition to other cases filed in the Western and Eastern Districts of Tennessee.

---

[8] Blechman made the same relevancy objection to Exhibit 21 as he did to the other PACER records relating to Yass's PACER account. See supra note 6. But the district court overruled that objection, and Blechman does not challenge that ruling on appeal.

On February 28, 2008, a surveillance video taken at the post office in Alla Vista, California, captured a woman later identified as Blechman's mother sending two express mail items to the U.S. Bankruptcy Court for the Western District of Tennessee. These mailings were ostensibly from "Murphy Investments" in Bartlett, Tennessee, and "Samuels Productions" in Jackson, Tennessee, respectively. On February 29, 2008, a bankruptcy petition listing "Sean Michael Murphy" d/b/a "Murphy Investments" as the debtor was filed in the Western District of Tennessee and assigned case number 08-22001. Then, on March 3, 2008, a bankruptcy petition listing "Martin Ronald Samuels" d/b/a "Samuels Productions" as the debtor was filed in the same court and assigned case number 08-10804.

During the early stages of the trial, the Government called Ted Willmann, the manager of the PACER service center in San Antonio, Texas, for the purpose of identifying and establishing a foundation for the admission of three PACER records labeled as Exhibits 22, 23, and 24. These records related to the activity of PACER account "RB1071," and the Government sought conditional admission of the records, subject to a later showing of relevancy, in anticipation of placing them before the jury later in the trial to prove that Blechman used PACER to access the Murphy bankruptcy filed by his mother, as well as other bankruptcies filed in the Western and Eastern Districts of Tennessee.

### i. Exhibit 22

Willmann explained that Exhibit 22 was a "screen capture" from PACER's "account maintenance application." (ROA, vol. V at 216; id. vol. XIV at 152 (Gov't Ex. 22 – PACER account maintenance application for "RB1071").) According to Willmann, the record identified the name of an individual who maintained an account with PACER. As Edward Walsh, the analyst in the U.S. Trustee's office, later clarified, Exhibit 22 specifically showed that PACER account "RB1071" was registered in the name of "Michael N. Sofris, Apc [A Professional Corporation]"; that "Robert A. Blechman" was the contact person on the account; and that the primary e-mail address for the account was "robert@sofris.com." (Id. vol. V at 1182–83.) On direct examination, Willmann testified that Exhibit 22 was a PACER record that was created and kept in the regular course of business. Accordingly, the Government moved for conditional admission of the exhibit under the business records exception to the hearsay rule; however, Blechman objected on the grounds that the Government failed to lay an adequate foundation under Rule 803(6). The district court overruled the objection and conditionally admitted the exhibit.

On cross-examination by Blechman's counsel, Willmann admitted that the information contained in Exhibit 22 was entered by someone accessing PACER on the Internet and that PACER could not verify the accuracy of the information: "We do some verification, but I don't know who filled it out is the person that they said they were." (Id. at 228.) The "some verification" mentioned by Willmann consisted of (1) sending a

13

mailing to the address entered at the time of registration to make sure that the mailing was not returned and (2) checking to see if any of the data entered was already associated with another account. Willmann conceded that this procedure did not verify the authenticity of the user-input information.

Although the Government secured conditional admission of Exhibit 22, the Government never sought to introduce the exhibit later in the trial. Yass, however, moved for unconditional admission of Exhibit 22 when he was cross-examining Walsh during the Government's case-in-chief. Although Blechman objected that the exhibit was outside the scope of the Government's direct examination of Walsh, he did not renew his hearsay objection. The district court overruled Blechman's new objection and fully admitted Exhibit 22.

### ii. Exhibits 23 and 24

Willmann similarly testified that Exhibits 23 and 24 were business records of PACER. According to Willmann, these exhibits showed that a specific account, "RB1071," accessed particular cases through PACER. (ROA, vol. V at 218, 220; id. vol. XIV at 159–60, 166 (Gov't Exs. 23, 24 – PACER account activity records for "RB1071").) The exhibits also included the same registration and contact information for account "RB1071" as did Exhibit 22. Additionally, both exhibits featured lists of all of the accounts that accessed certain cases through PACER. Finally, as Walsh later explained, the last page of each exhibit was a summary that he had prepared showing only activity for account "RB1071."

14

Walsh also clarified the content and purpose of these exhibits: Exhibit 23 contained information for bankruptcy cases in the Western District of Tennessee, while Exhibit 24 contained information for bankruptcy cases in the Eastern District of Tennessee. Furthermore, according to Walsh, the Tennessee bankruptcies "matched a similar pattern as these cases in Kansas." (Id. vol. V at 1313.) Thus, these exhibits showed that someone using PACER account "RB1071," which was associated with Michael Sofris and Robert Blechman, accessed Tennessee bankruptcy cases similar to the Kansas bankruptcies involved in the scheme described in the indictment. One of the cases that account "RB1071" accessed in the Western District of Tennessee was case number 08-22001, the Murphy bankruptcy that Blechman's mother filed.

The Government moved for conditional admission of Exhibits 23 and 24 under Rule 803(6) based on Willmann's testimony. Blechman lodged the same hearsay objection to these exhibits as he did to Exhibit 22, but the district court conditionally admitted both exhibits, finding that the Government laid an adequate foundation under the business records exception. As with Exhibit 22, however, the Government never moved for unconditional admission of Exhibits 23 and 24. Instead, Yass did so when Walsh was testifying as a witness for Yass during Yass's defense-in-chief. At that time, Blechman's counsel informed the court that he had no objection to the admission of the exhibits. Thus, the district court fully admitted Exhibits 23 and 24.

15

### 3.    Postal Money Orders

The Government called Karen Thompson, an employee at the post office in Alla Vista, California, to testify regarding Blechman's purchase of postal money orders corresponding to three of the fraudulent bankruptcy cases in Kansas. Thompson identified a series of still photos printed from a post-office surveillance video taken on January 10, 2008, between 1:52 P.M. and 1:59 P.M. These photos depicted a heavyset man with glasses at "Clerk No. 7's" window in the post office. Thompson also identified four money orders, two of which were purchased from "Clerk No. 7" on the same date and at the same time when the surveillance video was taken.[9] Three of the four money orders were made payable to bankruptcy courts in Kansas in the amount of $54.00 and contained notations indicating that the money was intended as an installment payment for the bankruptcy filing fee.[10] Each of these three money orders purported to be from one of the fictitious debtors in the fraudulent bankruptcy cases.

The individual who purchased the money orders on January 10, 2008, also sent priority mail items to Wichita, Kansas, and Baltimore, Maryland, at the same time and as part of the same purchase transaction. Barry Rausch, an investigator with the U.S. Postal Inspection Service, identified Blechman as the individual in the surveillance video and

---

[9] The other two money orders were purchased on December 11, 2007.

[10] The fourth money order was made payable to the U.S. Bankruptcy Court in Baltimore, Maryland, and was intended as the first installment payment for case number 08-10557.

photos who purchased the two money orders and sent the priority mail packages. Rausch further testified that the mailing to Wichita, Kansas, was associated with the filing of a fraudulent bankruptcy petition. Debra Campbell, an expert in forensic document examination, also testified on behalf of the Government. Having compared Blechman's handwriting samples to the writing on the four postal money orders identified by Thompson, she opined that Blechman prepared all of the money orders.

### 4. Yass's Trial Testimony

As noted above, Yass testified in his own defense during the trial. During his testimony, he blamed Blechman for all of the fraudulent bankruptcies:

> I'm innocent. . . . And I want to show how Mr. Robert Blechman has used my trust in him to plant a virus within my business in order to crash it. And the way he did that was by providing me with fake, fraudulent bankruptcies. Instead of giving me real ones like he was purchasing businesses and then filing them into bankruptcies, he just gave me fraudulent ones. Like time bombs that are exploding now.

(ROA, vol. V at 1347.) Yass claimed that he did not know that any of the bankruptcies were fraudulent until he was arrested. Instead, he believed that Blechman was putting real companies into bankruptcy and allowing him to use the company names to stop foreclosures. Yass testified that he paid Blechman $500 per bankruptcy and that part of Blechman's role was to keep track of the bankruptcies, which is why he provided Blechman with his PACER password. Yass also stated that Blechman acted as his "legal counselor." (Id. at 1514.)

17

## C.    Verdict and Post-trial Proceedings

On January 16, 2009, the jury found both defendants guilty of all thirteen counts charged in the indictment. On January 22, 2009, Blechman moved for judgment of acquittal on the identity theft counts (Counts 8–13) and on the conspiracy count (Count 1) to the extent that it charged conspiracy to commit aggravated identity theft. The district court granted the motion on July 6, 2009, and vacated Blechman's conviction as to those counts.[11] On January 4, 2010, the district court sentenced Blechman to eighteen months' imprisonment on each of the remaining counts, to be served concurrently. This appeal followed.

## III.    DISCUSSION

On appeal, Blechman argues that the district court erred in admitting Exhibit 1-BBB (the AOL record) and Exhibits 22, 23, and 24 (the PACER records) under Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. He contends that because the critical, user-identifying information in all of these records was input by a third party over the Internet and was not verified by AOL or PACER, the exhibits contained inadmissible double hearsay and should have been excluded. Further, he argues that he was harmed by admission of the exhibits because they constituted the primary evidence linking him to Yass's scheme. Although we agree with Blechman that

---

[11] The basis for Blechman's motion for judgment of acquittal and the district court's order granting that motion is not relevant to this appeal.

18

the district court erroneously admitted the challenged exhibits under Rule 803(6), we

conclude that the error was harmless to Blechman.[12]

---

[12] Blechman also claims that the district court erroneously admitted the e-mails from "rablechman@aol.com" to Yass that the Government offered to show that Blechman was an active participant in Yass's scheme.  According to Blechman, if Exhibit 1-BBB had been excluded, there would have been insufficient foundation for the admission of these e-mails.  Blechman did not object to the admission of the e-mails on foundation grounds below, so we review this argument only for plain error.  See United States v. Hasan, 526 F.3d 653, 660–61 (10th Cir. 2008) ("[W]hen a party fails to preserve an issue before the district court, our review is . . . limited to ascertaining whether the error charged on appeal qualifies as plain error.").  For several reasons, we conclude that Blechman has not come close to meeting his heavy burden of demonstrating plain error.

First, in his briefs to this Court, the entirety of Blechman's discussion of the foundation issue consists of a conclusory statement at the end of the section of his Opening Brief concerning the impropriety of admitting Exhibit 1-BBB under Rule 803(6):

> Because the exclusion of Exhibit 1-BBB would have eliminated the evidentiary link between the name "Robert Blechman" and the e-mail address "rablechman@aol.com," then there would not have been a sufficient foundation for the admission of the e-mails marked as Government Exhibits 1-FFF, 1-GGG, 1-HHH, 1-III, 1-JJJ, 1-KKK, 1-LLL, 1-MMM, 1-NNN, 1-OOO.  Therefore, the admission of those e-mails was also error.

(Aplt. Br. at 31–32.)  Blechman has neither mentioned the plain-error standard nor made any attempt to show how he can satisfy that standard.  "[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court."  Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1131 (10th Cir. 2011).

Second, it is not clear that Exhibit 1-BBB constituted the foundation (or even part of the foundation) for the admission of the e-mails.  Blechman has cited no portion of the record to support this assertion.

## A.  Standard of Review

"We review a district court's evidentiary rulings for an abuse of discretion, considering the record as a whole."  United States v. Ledford, 443 F.3d 702, 707 (10th Cir. 2005).  Given the fact- and case-specific nature of hearsay determinations, "our review of those decisions is 'especially deferential.'"  United States v. Hamilton, 413 F.3d 1138, 1142 (10th Cir. 2005) (quoting United States v. Chavez, 229 F.3d 946, 950 (10th Cir. 2000)).  Moreover, "if a party objects to a district court's hearsay ruling based solely on the Federal Rules of Evidence, we review for nonconstitutional harmless error."  Ledford, 443 F.3d at 707.

Because Blechman timely objected to the introduction of Exhibit 1-BBB on hearsay grounds, the parties agree that we review the district court's ruling admitting that exhibit under the abuse-of-discretion standard.  With regard to the PACER records (Exhbits 22, 23, and 24), however, the Government argues that we should review

---

Third, and on a related note, Blechman has not addressed whether sources other than Exhibit 1-BBB may have provided an adequate foundation for the admission of the e-mails, including, for example, the "distinctive characteristics" of the e-mails themselves.  See United States v. Safavian, 435 F. Supp. 2d 36, 39–40 (D.D.C. 2006) (explaining that e-mails may be authenticated by examination of their "distinctive characteristics," including e-mail addresses "contain[ing] the name of the person connected to the address" and the appearance of "the name of the sender or recipient in the bodies of the e-mail, in the signature blocks at the end of the e-mail, [or] in the 'To:' and 'From:' headings" (internal quotation marks omitted)).

Under these circumstances, the district court did not plainly err in admitting the e-mails introduced by the Government.  Accordingly, we assume that the e-mails were properly admitted.

Blechman's challenge for plain error because Blechman failed to renew his hearsay objection to these exhibits when Yass offered them for full admission after the Government had already achieved conditional admission under Rule 803(6). We disagree.

We begin our analysis by briefly recapping the sequence of events that led to the admission of the PACER records. After Ted Willmann, the PACER manager, testified that Exhibits 22, 23, and 24 were business records of PACER, the Government moved for conditional admission of those exhibits subject to a later showing of relevance. In other words, the Government sought a ruling from the district court that Willmann's testimony established an adequate foundation for the admission of the exhibits under Rule 803(6) and that the exhibits could come in upon a showing of relevance. Blechman objected to the admission of each of the exhibits on the grounds that the Government had not demonstrated that the exhibits met the requirements of Rule 803(6). But the district court overruled Blechman's objections and conditionally admitted the PACER records "subject to later determination of relevance or later showing of relevance." (ROA, vol. V at 216.) Later in the trial, Yass, not the Government, sought full admission of Exhibit 22 so that he could publish it to the jury. At that time, Blechman did not renew his hearsay objection. Even later, Yass moved for unconditional admission of Exhibits 23 and 24. Again, Blechman did not renew his hearsay objection.

Federal Rule of Evidence 103 states that "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, . . . a party need not renew an

21

objection . . . to preserve a claim of error for appeal." Fed. R. Evid. 103(a). Under the circumstances described above, we conclude that the district court's ruling on the issue of the admissibility of Exhibits 22, 23, and 24 under Rule 803(6) was sufficiently "definitive" that Blechman was not required to renew his hearsay objection in order to preserve that issue for appeal. Although the district court did not decide the ultimate admissibility of the records at the time of Blechman's objection, reserving the relevancy determination for a later point in the trial, the court unequivocally ruled that the Government had laid an adequate foundation for the admission of the PACER records under Rule 803(6). That determination was not conditioned upon subsequent developments at trial, nor did the district court suggest that it would be open to reconsidering the matter later. Thus, any renewed objection by Blechman to the district court's hearsay ruling "would [have been] in the nature of a formal exception and therefore unnecessary." United States v. Mejia-Alarcon, 995 F.2d 982, 986 (10th Cir. 1993) (holding, in the analogous context of motions in limine, that although "[a] pretrial motion in limine to exclude evidence will not always preserve an objection for appellate review," such a motion "may preserve an objection when the issue (1) is fairly presented to the district court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge"). Furthermore, a renewed objection may have amounted to "a needless provocation of the trial judge, not to mention a distracting interruption during the trial." Id.; see also United States v. Harrison, 296 F.3d 994, 1002 (10th Cir. 2002) (holding that although the district court's

22

pretrial ruling admitting hearsay statements under an exception to the hearsay rule "was conditional, rather than definitive, because it still required the prosecution to establish the credentials and methods of [the testifying agent]," the defendant was not required to renew his hearsay objection at trial because "the court made clear to defense counsel that it did not wish to hear repetitive argument on the matter"). Accordingly, we hold that Blechman adequately preserved his hearsay challenge to the admission of the PACER records, and so we review that ruling by the district court under the abuse-of-discretion standard as well.

**B.     Layered Hearsay and the Business Records Exception**

The Federal Rules of Evidence define "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is generally inadmissible unless it falls within a specific exception to the hearsay rule. See Fed. R. Evid. 802.

In this case, it is undisputed that the AOL record and PACER records were offered to prove the truth of the matters asserted in these documents—namely, that Blechman was the registered owner of the "rablechman@aol.com" e-mail address and that Blechman was associated with PACER account "RB1071," which someone used to access fraudulent bankruptcy cases in Tennessee. Accordingly, the records constitute hearsay.

Nevertheless, the district court admitted the records under the business records exception to the hearsay rule, which provides that certain records of regularly conducted

23

business activity are admissible for their truth even though they contain hearsay. Fed. R. Evid. 803(6).[13] To satisfy the business records exception, a record

> must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made were trustworthy.

United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008). Blechman argues that Exhibit 1-BBB and Exhibits 22, 23, and 24 do not meet these requirements because the records feature "double" or "layered" hearsay in the form of unverified user-input information.

---

[13] Federal Rule of Evidence 803(6) provides as follows:

The following are not excluded by the hearsay rule . . . .:

. . . .

**(6) Records of Regularly Conducted Activity.**--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

"Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." United States v. Gwathney, 465 F.3d 1133, 1141 (10th Cir. 2006) (internal quotation marks omitted). If the person who provides the information is an outsider to the business who is not under a business duty to provide accurate information, then the reliability rationale that underlies the business records exception ordinarily does not apply. See Ary, 518 F.3d at 787 ("The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information. If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails." (ellipsis, citation, and internal quotation marks omitted)); see also United States v. Snyder, 787 F.2d 1429, 1433–34 (10th Cir. 1986) ("The business records exception is based on a presumption of accuracy, accorded because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the nation's business. The reason underlying the business records exception fails, however, if any of the participants is outside the pattern of regularity of activity." (citation and internal quotation marks omitted)). Accordingly, the general rule is that "[a]ny information provided by . . . an outsider to the business preparing the record[] must itself fall within a hearsay exception to be admissible." Gwathney, 465 F.3d at 1141; see also Fed. R. Evid. 805 ("Hearsay included within

25

hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

This Court, however, has recognized one exception to the general rule: information provided by an outsider that is included in a business record may come in under the business records exception "[i]f the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person." United States v. McIntyre, 997 F.2d 687, 700 (10th Cir. 1993); see also United States v. Cestnik, 36 F.3d 904, 908 (10th Cir. 1994). In the context of identity information provided by an outsider, we have identified "two ways to demonstrate this 'guarantee[] of trustworthiness': (1) proof that the business has a policy of verifying [the accuracy of information provided by someone outside the business]; or (2) proof that the business possesses 'a sufficient self-interest in the accuracy of the [record]' to justify an inference of trustworthiness." Cestnik, 36 F.3d at 908 (some alterations in original) (quoting McIntyre, 997 F.2d at 700).

Applying these principles, we conclude that the district court erred in admitting Exhibit 1-BBB and Exhibits 22, 23, and 24 under Rule 803(6). It is undisputed that the crucial information in the AOL and PACER records—specifically, the information concerning the identity of the user of the "rablechman" AOL account and the user of PACER account "RB1071"—was provided by a third party over the Internet, not by an employee of AOL or PACER. Thus, the Government was required to demonstrate the trustworthiness of the information in one of the two ways mentioned above. See United

26

States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir. 1999) ("The obligation of establishing the applicability of a hearsay exception for these records falls upon the government as the proponent of the evidence.").

But the record makes clear that neither AOL nor PACER made a meaningful attempt to verify the identity of the person who submitted the information. Beginning with AOL, Patricia Johnson, the AOL investigator, admitted that AOL did not verify who input the "subscriber information" contained on the third page of Exhibit 1-BBB and that it could have been "anybody in the world who could access a computer." (ROA, vol. V at 329.) Moreover, Exhibit 1-BBB states in no uncertain terms that AOL made no effort to verify the identity of the individual who registered the "rablechman" account: "Registration information is recorded but not verified. Fictitious names and addresses are common." (Id. vol. XI at 13 (Gov't Ex. 1-BBB – AOL account information for "rablechman").) With respect to PACER, Ted Willmann, the PACER manager, acknowledged that PACER did no more than ensure that whoever created account "RB1071" entered a valid mailing address and did not provide identifying information matching that of an existing user. PACER took no steps, however, to verify the authenticity of the identifying information. Furthermore, nothing in the record suggests—and the Government does not argue—that either AOL or PACER "had a sufficiently compelling self-interest in ensuring the accuracy of information filled out by [their] customers to justify an inference of reliability." Cestnik, 36 F.3d at 908. If anything, the record reveals that AOL and PACER were uninterested in the accuracy of

27

the user-input information.  For these reasons, the district court improperly admitted

Exhibit 1-BBB and Exhibits 22, 23, 24 under the business records exception to the

hearsay rule.[14]

---

[14] The Government raises one alternative ground for affirming the district court's admission of Exhibit 1-BBB.  Specifically, the Government argues that Exhibit 1-BBB was transformed from hearsay into admissible non-hearsay under Rule 801(d)(2)(B) later in the trial when Blechman allegedly manifested his belief in the truth of the information contained in that exhibit.  Rule 801(d)(2)(B) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."  According to the Government,

> [T]he defendant's introduction of six e-mails from rablechman@aol.com to Yass during his cross-examination of Yass, along with his eliciting from Yass that each e-mail came from the defendant, manifested a belief in the truth of the information in Exhibit 1-BBB establishing an evidentiary link between the name "Robert Blechman" and the e-mail address "rablechman@aol.com."  Thus, once the defendant introduced his first e-mail from rablechman@aol.com . . . and solicited from Yass that this e-mail came from the defendant, Government's Exhibit 1-BBB ceased to be hearsay, and the basis for the defendant's objection evaporated altogether because an adoptive admission under Rule 801(d)(2)(B) "is not hearsay."

(Aple. Br. at 31–32 (citation omitted).)

This Court <u>may</u>, of course, uphold the district court's admission of evidence "on any ground that finds support in the record, even where the lower court reached its conclusion[] from a different or even erroneous course of reasoning." <u>Ledford</u>, 443 F.3d at 707 (internal quotation marks omitted).  In this case, however, we need not decide whether Exhibit 1-BBB "ceased to be hearsay" at some point after the district court's erroneous admission of the exhibit under Rule 803(6), as we can affirm Blechman's convictions on harmless-error grounds.  <u>See</u> United States v. McHorse, 179 F.3d 889, 901 (10th Cir. 1999) ("We may affirm if the evidence was admissible on any ground <u>or</u> if the erroneous admission of the evidence was harmless error." (emphasis added)).

28

## C.    Harmless Error

That the district court erroneously admitted Exhibit 1-BBB and Exhibits 22, 23, and 24 as business records does not automatically entitle Blechman to relief.  We will not reverse a defendant's conviction on the basis of the district court's erroneous admission of hearsay evidence if the error was harmless to the defendant.  See Ledford, 443 F.3d at 712.  As mentioned above, when a defendant objects to a district court's admission of hearsay "based solely on the Federal Rules of Evidence," we apply the nonconstitutional harmless error standard.[15]  Id. at 707.  Under that standard, "[a] harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect."  United States v. Collins, 575 F.3d 1069, 1073 (10th Cir. 2009) (internal quotation marks omitted); see also Cestnik, 36 F.3d at 910 ("A nonconstitutional error, such as the erroneous admission of evidence under a well-established exception to the hearsay rule, is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." (internal quotation marks omitted)).  We "review[] the record as a whole de novo to evaluate whether the error [was] harmless, examining the context, timing, and use of the erroneously admitted evidence at trial and how it compares to properly admitted

---

[15] If a defendant objects to a hearsay statement on the ground that admission of the statement violates his rights under the Confrontation Clause, "we apply the constitutional harmless error standard of review."  United States v. Joe, 8 F.3d 1488, 1497 (10th Cir. 1993).  Under that standard, "[a] constitutional error may be deemed harmless only if it was 'harmless beyond a reasonable doubt.'"  Id. (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

29

evidence." United States v. Hanzlicek, 187 F.3d 1228, 1237 (10th Cir. 1999); see also

United States v. Flanagan, 34 F.3d 949, 955 (10th Cir. 1994) ("[W]e must perform our

harmless error analysis by judging the evidence in the context of all of the evidence

presented at trial."). The burden is on the Government to prove that the nonconstitutional

error was harmless. Ledford, 443 F.3d at 712.

### 1. Exhibit 1-BBB

We first consider the improperly admitted AOL account record. Blechman argues

that the admission of Exhibit 1-BBB harmed him because the exhibit linked him to the e-

mail address "rablechman@aol.com," which allowed the jury to conclude that he was the

person who was sending incriminating e-mails to Yass. The Government contends,

however, that the admission of Exhibit 1-BBB could not have influenced the outcome of

the trial because other overwhelming evidence linked Blechman to the

"rablechman@aol.com" e-mail address. We are persuaded by the Government's

argument. Several other pieces of evidence that were properly admitted during the course

of the trial connected Blechman to the "rablechman@aol.com" e-mail address, which

undermines his claim that Exhibit 1-BBB influenced the outcome of the trial. See United

States v. Clifton, 406 F.3d 1173, 1179 (10th Cir. 2005) ("Where the wrongly admitted

evidence was cumulative of other properly admitted evidence, it is less likely to have

injuriously influenced the jury's verdict." (alteration and internal quotation marks

omitted)); Flanagan, 34 F.3d at 955 (concluding that the district court's erroneous

admission of testimony indicating that the defendant was involved in a prior scam was

harmless because "evidence of [the defendant's] involvement in the [prior] scam was properly admitted elsewhere in the record").

We start with the e-mails themselves.[16] Not only is Blechman's name in the "rablechman@aol.com" e-mail address, but each e-mail from "rablechman@aol.com" contained the following signature block, which plainly identifies Blechman as the sender:

Robert A. Blechman – Real Estate Agent & Financing Specialist; Case Manager & Paralegal
American Realty & Financial Services; and,
Michael N. Sofris, A Professional Law Corporation
10736-666 Jefferson Boulevard – Culver City, California 90230-4969 [or 90230-4933]
Telephone (310) 945-5924 – Facsimile (310) 362-0307 – E-Mail: rablechman@aol.com

(ROA, vol. XI at 32–55 (Gov't Exs. 1-FFF, 1-GGG, 1-HHH, 1-III, 1-JJJ, 1-KKK, 1-LLL, 1-MMM, 1-NNN, and 1-OOO).) Thus, the e-mails provided some evidence that Blechman was the user of the "rablechman@aol.com" e-mail address.

Furthermore, Exhibit 1-AAA, the Yahoo! account record, contained the exact same information that Blechman finds objectionable in Exhibit 1-BBB. Specifically, Exhibit 1-AAA showed that Blechman maintained "rablechman@aol.com" as an alternate e-mail address to his "rablechman@yahoo.com" address. (ROA, vol. XI at 9–10 (Gov't Ex. 1-AAA – Yahoo! account management tool for "rablechman").). Blechman did not object to the district court's admission of this exhibit, nor does he challenge its admission on appeal.

---

[16] As noted above, Blechman has not shown plain error in the admission of the e-mails, so we assume that they were properly before the jury. See supra note 12.

Finally, Blechman himself introduced evidence indicating that "rablechman@aol.com" was his e-mail address. When cross-examining Yass, Blechman offered a series of e-mails from "rablechman@aol.com" to Yass for the purpose of showing that he did no more than provide accurate legal advice to Yass. Blechman elicited testimony from Yass that each of these allegedly exculpatory e-mails was sent by Blechman. Thus, Blechman affirmatively put before the jury evidence of the link between himself and "rablechman@aol.com" in order to advance his defense.

In light of all of the properly admitted evidence linking Blechman to the "rablechman@aol.com" e-mail address, we conclude that the Government has met its burden of demonstrating that the district court's erroneous admission of Exhibit 1-BBB was harmless to Blechman.

### 2. Exhibits 22, 23, and 24

We next turn to the PACER records. Blechman contends that the admission of Exhibits 22, 23, and 24 harmed him because they showed that he was the individual using PACER account "RB1071" to "monitor[] fraudulent [bankruptcy] petitions in Tennessee that mirrored the content and form of the [Kansas] petitions that were the subject of the Indictment." (Aplt. R. Br. at 7.) The Government, by contrast, argues that the evidence against Blechman was overwhelming and that "[t]he introduction of records showing that [Blechman] accessed fraudulent bankruptcy cases in Tennessee with his own PACER account did not appreciably add to the collective weight of this overwhelming evidence." (Aple. Br. at 41.) We agree with the Government. Given the amount of other evidence

in the record that more directly linked Blechman to Yass's scheme and the Kansas bankruptcies identified in the indictment, we must reject Blechman's argument that admission of these exhibits influenced the outcome of the trial.

Our cases recognize that the probative value of the erroneously admitted evidence and the overall strength of the other evidence against the defendant are critical factors in the harmless-error analysis. See, e.g., United States v. Pursley, 577 F.3d 1204, 1227 (10th Cir. 2009) (holding that admission of an exhibit was harmless where, among other things, the exhibit "offered little probative evidence" of the defendant's guilt); United States v. Perez, 989 F.2d 1574, 1583–84 (10th Cir. 1993) (en banc) (holding that the district court's erroneous admission of hearsay statements was harmless because the evidence of the defendant's guilt was "overwhelming"). Here, the challenged PACER records showed that Blechman was involved with fraudulent bankruptcies in Tennessee, but they did not connect him to the fraudulent Kansas cases that formed the basis for the charges against him. Thus, as Blechman himself acknowledges, the records had "slim (if any) evidentiary relevancy."[17] (Aplt. Br. at 16.) Moreover, all of the following, more probative evidence demonstrated Blechman's involvement in the scheme described in the indictment: (1) Blechman's e-mails to Yass; (2) the photos, other documentary evidence, and testimony indicating that Blechman filled out and mailed money orders in the names

---

[17] This may explain why the Government never moved for full admission of the exhibits.

33

of fictitious debtors in the Kansas bankruptcy cases; (3) a different PACER record, Exhibit 21, revealing that someone using Yass's PACER account after Yass's arrest accessed three of the Kansas bankruptcies from an IP address associated with Blechman's Yahoo! account; and (4) Yass's trial testimony describing Blechman's role in the scheme. In view of this evidence and the minimal probative value of Exhibits 22, 23, and 24, we are convinced that the admission of those exhibits was harmless to Blechman.[18]

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM Blechman's convictions for mail fraud and conspiracy to commit mail fraud.

---

[18] Although Blechman does not use the term, his Opening Brief can be read as raising a cumulative-error argument. (See Aplt. Br. at 33 ("The exhibits from AOL and PACER, and the other exhibits for which they served as foundation evidence, taken together had a substantial influence on the outcome of the trial.").) "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). We conclude that the district court's errors in admitting Exhibit 1-BBB and Exhibits 22, 23, and 24 were harmless even when considered collectively.

10-3034 - *United States v. Blechman*

**HARTZ**, Circuit Judge, concurring:

I fully join Judge Ebel's opinion. I write separately only to point out that if the challenged documents had been properly offered for admission, the embedded-hearsay problem could have been avoided. Although the documents were not admissible as assertions that the e-mail address was Blechman's, they were admissible to show that the e-mail address belonged to someone who claimed to be Blechman and provided his name and street address.

I recognize that almost 20 years ago in *United States v. McIntyre*, 997 F.2d 687 (10th Cir. 1993), we rejected the view of the Second Circuit in *United States v. Lieberman*, 637 F.2d 95, 101 (1980), which upheld the admission of a hotel guest card for the nonhearsay purpose of showing that the person who registered used a particular name (not that the person who registered was the person named). We said that there was no distinction between (1) offering a motel registration card to prove that the defendant herself checked into the hotel and (2) offering the card to prove that someone claiming to have the same name as the defendant checked into the motel. *See McIntyre*, 997 F.2d at 699 n.9. Since then, we have explained our holding in *McIntyre* as based on a concern "that offering an asserted identity to prove that the named individual took the action in question, or merely to prove that someone claiming to be the named individual took the action in question, was simply an artificial, semantic distinction that factfinders would

likely find indistinguishable." *United States v. Cestnik*, 36 F.3d 904, 908 n.3 (1994); *see United States v. Moreno*, 94 F.3d 1453, 1455 (10th Cir. 1996).

In recent years, however, the public has been bombarded with tales of identity theft. What might have been a subtle distinction in decades past, is now almost a matter of common sense. Jurors would be likely to use the documents only for their proper nonhearsay purpose. They will know very well that someone other than Blechman may have opened an email account in Blechman's name. They will want additional evidence before deciding that the person who opened the account was indeed Blechman. But when they make their decision, they should be permitted to consider the identification information used by whoever opened the account. Indeed, our opinion in this case recognizes that the presence of sufficient identifying information (the signature block on Blechman's e-mail, *see* Op. at 31) would suggest that the person providing that information was the identified person. In sum, I do not think that a district court would be abusing its discretion in admitting such evidence for the nonhearsay purpose if it found that the likelihood of jury confusion was minimal.